OLSON v. CHICAGO, B. & Q. R. CO. et al.

(Circuit Court of Appeals, Eighth Circuit. March 9, 1918.)

No. 4830.

1. CARRIERS ⬅218(10)—INJURY TO LIVE STOCK—STIPULATION FOR NOTICE—CONSTRUCTION.

A provision in a live stock shipping contract, that in case any loss or damage shall have been sustained for which the carrier is liable, demand or claim for such loss shall be made in writing within 10 days after unloading the stock, includes all loss and damage by injury or death of the animals en route, as well as at terminals.

2. CARRIERS ⬅218(10)—CARRIAGE OF LIVE STOCK—CONTRACTS—CONSTRUCTION.

Where cattle injured by exposure during the first part of their journey were unloaded at a way station, and the shipper, having there disposed of the bulk of the animals, had the remainder transported under the original bills of lading to the destination named, but the cattle were not injured in the latter carriage the 10-day period after unloading within which notice of loss was required to be given by the bill of lading, runs from the time of unloading at the way station and transportation to the original destination did not extend the period.

3. CARRIERS ⬅218(3)—CARRIAGE OF LIVE STOCK—AGREEMENTS.

An agreement in a reduced rate contract for the shipment of live stock requiring notice of loss or damage to be given within 10 days after the animals should be unloaded, on penalty of waiver, is valid, being fair, just, and reasonable.

4. CARRIERS ⬅32(2)—AGREEMENTS—WAIVER.

Where a live stock shipping contract for an interstate shipment at reduced rate provided that failure to give notice of loss within 10 days after unloading should be a waiver of the same, and the contract or bill of lading had been duly filed with the Interstate Commerce Commission, a connecting carrier is not authorized, in view of the act to regulate commerce and the Carmack Amendment of the Hepburn Act (Act June 29, 1906, c. 3591, § 7, pars. 11, 12, 34 Stat. 595 [Comp. St. 1916, §§ 8604a, 8604aa]), to waive the requirement, which was for the benefit of all carriers, by receiving oral complaints, for that would open opportunities to discriminations prohibited by the statutes; it appearing that the initial carrier was prepared at a higher rate to transport the animals without such requirement.

5. CARRIERS ⬅218(10)—CARRIAGE OF LIVE STOCK—LOSS—NOTICE.

A telegram by a shipper to an officer of the railroad company, notifying him that a shipment of cattle would suffer injuries if precautions were not taken, is not notice of loss or damage, within the provisions of the bill of lading requiring written notice of the same within 10 days after unloading, under penalty of waiver.

6. CARRIERS ⬅218(10)—CARRIAGE OF LIVE STOCK—NOTICE OF LOSS—SUFFICIENCY.

Where a live stock shipping contract required written notice of loss or damage to be given within 10 days after unloading, under penalty of waiver, oral notice of loss, given to an agent at the point where the animals were unloaded, although followed by investigation, cannot be deemed sufficient, for that would be an abrogation of the contract.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Southern District of Iowa; Martin J. Wade, Judge.

Action by Theodore Olson against the Chicago, Burlington & Quincy Railroad Company and others. There was a judgment for defendants, and plaintiff brings error. Affirmed.

George H. Mayne, of Council Bluffs, Iowa (Mayne & Green, of Council Bluffs, Iowa, on the brief), for plaintiff in error.

George J. Mersereau, of Kansas City, Mo. (Thomas R. Morrow and John H. Lathrop, both of Kansas City, Mo., and John P. Organ, of Council Bluffs, Iowa, on the brief), for defendant in error Atchison, T. & S. F. Ry. Co.

George S. Wright, of Council Bluffs, Iowa, for defendants in error Chicago, B. & Q. R. Co. and others.

Before SANBORN and SMITH, Circuit Judges, and TRIEBER, District Judge.

SANBORN, Circuit Judge. About April 20, 1913, the Southern Pacific Company contracted with Theodore Olson to transport 30 carloads of cattle at a lower rate on a declared valuation from Huachuca, Ariz., to Missoula, Mont. The cattle were delivered to it on April 20, 1913; they were carried over the railroad of the Southern Pacific Company to Deming, N. M., thence over the railroad of the Atchison, Topeka & Santa Fé Railroad Company to Denver, Colo., and thence over the railroad of the Chicago, Burlington & Quincy Railroad Company to Billings, Mont., where they arrived and were unloaded on April 29, 1913, and where, on May 5th or 6th, Olson sold about 17 carloads of them, paid the freight and charges thereon on May 17, 1913, and some days later shipped the remaining 11 carloads of the cattle on to Missoula. As the cattle approached Raton on the Atchison, Topeka & Santa Fé Railroad, where it was necessary to unload them for feed, rest, and water, the weather became cold and stormy, and some of the cattle became chilled or frozen, so that by the 7th of May following about 90 of them had died. On April 23, 1913, as the train carrying the cattle was climbing up toward Raton, Olson telegraphed the superintendent of the Atchison, Topeka & Santa Fé Railroad Company thus:

"Bad run all the way from Albuquerque snow storm here now impossible unload at Raton cattle will chill to death up to you and company get cattle on feed La Junta."

Before their arrival at Raton, Mr. Scott, a freight transportation inspector of the railroad company, came upon the train, stayed with it that night and the next day, and saw the condition of the cattle. Olson protested against unloading them at Raton, but Scott ordered them unloaded, fed, and watered in muddy pens, where several of them died that night. Olson told the agent of the railroad company at Billings, within 10 days after the damage to the cattle, that he should claim damages from the railroad company for the injury they had sustained by the negligence of that company in transporting them. By the live

stock shipping contracts and bills of lading of the Southern Company, under which these cattle were transported, Olson agreed:

"That in case any loss or damage shall have been sustained for which first party [the Southern Company] is liable, demand or claim for such loss or damage will be made by second party [Olson] on the freight claim agent of first party in writing, within ten days after unloading of the live stock, and that in event of failure so to do, all claims for loss or damage in the premises are hereby expressly waived, released, and made void."

On May 17, 1913, the attorneys for Mr. Olson wrote and mailed at Council Bluffs, Iowa, a letter addressed to general claim agent of the Atchison, Topeka & Santa Fé Railway Company, at Chicago, Ill., in which they made a claim and demand upon the company, on behalf of Mr. Olson, for damages on account of its negligence in the transportation of the 30 cars of cattle. In August, 1913, they brought this action for these damages against the Southern Pacific Railroad Company, the Atchison, Topeka & Santa Fé Railway Company, and the Chicago, Burlington & Quincy Railroad Company. The companies defended on the ground that no claim or demand for the damages was made in writing within 10 days after the unloading of the cattle, and on the ground that the damages, if any, resulted from the fact that the cattle were too weak and unfit for shipping. During the course of the trial the court excluded evidence of the oral notice of Olson's claim for damages given to the agent at Billings within 10 days after the unloading, held that the 10 days' time for the giving of the written notice ran from the unloading at Billings on April 29, 1913, that the notice of May 17, 1913, was too late, and upon that ground directed a verdict for the defendants at the close of the plaintiff's evidence. These rulings are assigned as error.

[1] It is contended that these decisions of the court below were erroneous: (a) Because no written notice was required by the terms of the contract of injury or damage resulting from the death of the cattle that died at Billings and before the cars arrived at that town; and (b) because the time for the giving of the notice did not begin to run until the cattle in the 11 cars which finally went to Missoula were unloaded there some days after May 7, 1913. But the contract clearly required the written notice of "any loss or damage * * * for which first party is liable," and this included all loss and damage by injury or death en route as well as at terminals.

[2] At the close of the plaintiff's case there was no evidence that any cattle which finally reached Missoula were in any way injured by the negligence of the defendants. All the damage of which there was any evidence was to the cattle that had died at Billings, those that had died before they reached there, and those that were sold at Billings. All the living cattle were unloaded at Billings on April 29, 1913. By the night of May 6, 1913, Olson had advertised and sold all the cattle that had not died, except 11 carloads. He had thus sold about 17 carloads. On May 7, 1913, he paid the railway company for the feed and transportation of these 17 carloads of cattle, and some days later he loaded the remaining cattle, to which no evidence of damage was offered, into 11 cars and shipped them on to Missoula under the original bills of lading. As all the damage claimed was to the cattle that were unloaded

and sold at Billings, to those that died there, and to those that died before the train reached there, there was no error in the decision of the court below that the time for the giving of the notice commenced to run from the unloading at Billings on April 29th, and that the notice of May 17th was too late. The plaintiff could not extend indefinitely the time for giving notice of his claim for damages that were complete to cattle whose transportation had ceased, by holding a few carloads of cattle that were not injured at a way station as long as he chose and then shipping them to their original destination. Any other ruling would open the door wide to that discrimination between shippers against which the act to regulate commerce was expressly leveled. It would permit a railroad company to allow a favored shipper to wait so long before he gave his notice that it might be impossible for the company to ascertain his damages, while the company might require other shippers to give prompt and timely notices. Moreover, the through bill of lading, and the contract it contains, bound all the carriers over whose railroads the shipment passed, and such a practice would allow any one of the companies bound by it to enlarge and extend the liabilities of all the others far beyond the terms of the written contract.

[3-5] Counsel argue that the telegram of April 23, 1913, sent before the damages were sustained, and the knowledge of Mr. Scott, the freight transportation agent of the Atchison, Topeka & Santa Fé Railway Company, who was present at Raton the night the cattle arrived there and the next morning, and saw their condition and the injury then inflicted upon them, the oral notice of his claim for damage which Olson gave to Mitchell, the agent of the company at Billings, within 10 days after April 29, 1913, and the fact that the company received the written notice of May 17, 1913, acknowledged its receipt, and proceeded to investigate the claim for damages, waived and rendered futile the provision of the contract that the shipper should give written notice of his claim and demand within 10 days after the unloading of the cattle, and that in case of the failure to give such notice all claims for loss and damage in the premises were waived, released, and made void.

But this was an interstate shipment under an interstate contract, and the shipment and the contract are alike subject to and are governed by the act to regulate commerce (24 Stat. 379, 380, §§ 2, 3, 6 [U. S. Comp. St. 1916, §§ 8563, 8564, 8565, 8569]), the Carmack Amendment of the Hepburn Act of June 29, 1906 (34 Stat. 584, 595, c. 3591 [Comp. St. 1916, §§ 8604a, 8604aa]), and the principles and rules for the construction and application of these acts and of such contracts as that herein, which have been established by the federal courts (Adams Express Co. v. Croninger, 226 U. S. 491, 505, 506, 509, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. [N. S.] 257; Southern Railway Co. v. Prescott, 240 U. S. 632, 639, 640, 36 Sup. Ct. 469, 60 L. Ed. 836). The contract for notice of the claim or demand in writing within 10 days after the unloading was fair, just, and reasonable. That agreement, made by Olson with the Southern Company, the initial carrier, bound that company, the Atchison, Topeka & Santa Fé Railway Company, and the Chicago, Burlington & Quincy Railroad Company under the

provisions of Act June 29, 1906, 34 Stat. 595, and each of said companies was protected by and had the right to rely upon the terms of that contract. The parties to this action stipulated at the trial that at the time this contract was made and this shipment moved the Southern Pacific Railway Company had in force a duly established tariff carrying separate and distinct rates, one a higher and the other a lower rate the latter of which was applicable when a shipment moved as this one did under the contract which was made between these parties limiting the common-law liability of the railway company. In view of the repeated and persistent prohibition by the acts of Congress of all unjust and unreasonable discrimination, the prohibition of the giving of undue or unreasonable preferences, and of the granting, directly or indirectly, of any rebate, drawback, or other device or favor, whereby a greater or less compensation for any service shall be paid by one person than is paid by another similarly situated for a like service, of the legal presumption that the Southern Pacific Railway Company was making this contract regarding notice with all shippers contracting for the lower rate, in view of the relations between shippers and all the railroads over which freight moves under such a contract, and of the opportunity and invitation to discrimination and preference which a decision that any one of the carriers bound by such a contract may waive the written notice of demand and damage by receiving an oral notice, or by conversation with a claimant, or by investigating the claim, would present, the conclusion is that the evidence of the oral notice was incompetent, and that the Southern Company did not waive its contract for the written notice. St. Louis, Iron Mountain & Southern Ry. Co. v. Starbird, 243 U. S. 592, 606, 607, 37 Sup. Ct. 462, 61 L. Ed. 917. In Phillips v. Grand Trunk Railway, 236 U. S. 662, 667, 35 Sup. Ct. 444, 446 (59 L. Ed. 774), the Supreme Court said:

"To permit a railroad company to plead the statute of limitations as against some and to waive it as against others would be to prefer some and discriminate against others in violation of the terms of the Commerce Act which forbids all devices by which such results may be accomplished."

Moreover, the telegram of April 23, 1913, was sent and received before the damage was inflicted. The knowledge of the situation of the cattle on that day and night and on the next day by Mr. Scott was by no means the equivalent of a notice by the shipper of his claim for damages. The extent of the damage was probably not then known, nor was it known that Olson would claim any damages, nor could any one perceive what part of the damages, if any, was chargeable to the railroad company. To hold that the oral notice to Mitchell at Billings was sufficient would be to abrogate the express terms of the contract which the parties voluntarily made. Chesapeake & Ohio R. Co. v. McLaughlin, 242 U. S. 142, 37 Sup. Ct. 40, 61 L. Ed. 207; Clegg v. St. Louis & S. F. R. Co., 203 Fed. 971, 973, 122 C. C. A. 273; Kidwell v. Oregon Short Line R. Co., 208 Fed. 1, 3, 125 C. C. A. 313.

The result is that there was no error in the trial of this case, and the judgment below must be affirmed.

It is so ordered.