INSURANCE CO. OF NORTH AMERICA
v. NEWTOWNE MFG. CO.

INSURANCE CO. OF NORTH AMERICA
v. HOLLAND TRANSP. CO., Inc.

Nos. 4513, 4514.

United States Court of Appeals
First Circuit.

March 15, 1951.

Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and CLIFFORD, District Judge.

MAGRUDER, Chief Judge.

Newtowne Manufacturing Company, a Massachusetts corporation, brought an action in the Superior Court for Suffolk County, Massachusetts, against the Insurance Company of North America, a Pennsylvania corporation, on a transportation policy insuring Newtowne against loss of fabrics and manufactured products while in the custody of a public truckman. Defendant North America procured the removal of the case to the United States District Court for the District of Massachusetts on the ground of diversity of citizenship. In the latter court, North America brought in Holland Transportation Company as a third-party defendant, pursuant to Rule 14 of the Federal Rules of Civil Procedure, 28 U.S.C.A., alleging that if North America were liable to Newtowne under the transportation policy, North America was entitled to recover judgment against Holland by way of subrogation to Newtowne's claim against Holland on the contract of carriage. Holland, in turn, brought in North River Insurance Company as a fourth-party defendant, alleging that if Holland were liable for the loss of the shipment in transit, Holland was entitled to recover from North River Insurance Company on a policy issued by the latter.

After the case was tried and the jury had brought in its special verdict answering certain questions propounded by the court, a motion by North River Insurance Company for a directed verdict in its favor was granted. The granting of this motion was with the acquiescence of Holland as fourth-party plaintiff, apparently on the view that, under the evidence, if Holland was liable for the loss of the shipment, the loss must have been due to the dishonesty of one of its own employees, a risk not covered by North River Insurance Company's policy. A motion by North America for a directed verdict in its favor on the original complaint was denied. The court gave

Richard J. Cotter and George B. Rowell, Boston, Mass. (Francis E. Silva, Jr., Boston, Mass., on the brief; Warner, Stackpole, Stetson & Bradlee, Boston, Mass., of counsel), for Insurance Co. of North America.

Joseph B. Abrams, Boston, Mass., for Newtowne Mfg. Co. etc.

John M. Russell, Boston, Mass. (Solomon Mondlick and Paul F. Perkins, Jr., Boston, Mass., on the brief; Ropes, Gray, Best, Coolidge & Rugg, Boston, Mass., of counsel), for Holland Transp. Co., Inc.

judgment for *plaintiff* Newtowne against North America in the sum of $9,856.69, and gave judgment for the third-party defendant, Holland Transportation Company, against North America as third-party plaintiff. From each judgment North America appealed. The two appeals were heard by us on a consolidated record.

Just what happened to the goods in question is an unsolved mystery, which fortunately this court does not have to unravel. Upon conflicting testimony, it is settled by the special verdict of the jury that the goods were delivered by Newtowne to an authorized or apparently authorized agent of Holland Transportation Company, so that Holland as a public carrier became responsible for the safe carriage and delivery of the goods to the consignee, and thus was liable for the disappearance of the goods in the course of transportation, subject to the defense—which the district court held to be well taken—that the carrier was relieved of such liability because of the failure of the shipper Newtowne to comply with a provision in the bill of lading, expressed as a "condition precedent to recovery," requiring the shipper to file with the carrier a claim "in writing" within nine months after a reasonable time for delivery has elapsed.

The key witness for the plaintiff Newtowne was its shipping manager, Lovecchio.

Lovecchio testified that on the afternoon of March 6, 1947, Newtowne had in its shipping room ready for shipment to Howard Stores, Inc., in New York, four cases of men's raincoats. About 3:30 that afternoon Lovecchio made a telephone call to Holland Transportation Company . and talked to Holland's dispatcher, whose voice he recognized as familiar. In response to Lovecchio's request for a truck to pick up the shipment, the dispatcher replied that he would send one around within an hour. Holland was located nearby Newtowne's premises, and for that reason Holland was the only carrier which Lovecchio would call that late in the day for the pickup of a shipment. About four o'clock on the same afternoon a big tractor-trailer unit backed down the narrow alley to Newtowne's shipping platform. After the driver had rung the bell and announced that he was. from Holland, Lovecchio unlocked the door from the inside and admitted the driver to the shipping room. Lovecchio recognized the driver as a Holland employee who had previously called for shipments; he testified that if he had not so recognized the driver, he would have called Holland to verify his identity, as he had done before when strange drivers appeared.[1] According to Lovecchio, though the alley was so narrow as to make it impossible to see the printing on the sides of the truck, he recognized it as a Holland truck; Holland was the only trucking company which called for goods at Newtowne with this particular kind of tractor-trailer unit. There were some other goods in the truck at the time of its arrival.

With the aid of his helper and of the driver of the truck, Lovecchio loaded the four packing cases on to the truck. In accordance with the usual practice, the goods were not relinquished to the driver's custody until the driver signed the bills of lading and the shipping book, which was a kind of receipt. Since there appeared to be nothing out of the ordinary in the transaction, Lovecchio did not notice at the time the name which the driver had signed. The driver then drove off with the goods, and their whereabouts have never since been accounted for. No other truck from Holland called later on the afternoon of March 6, 1947, to pick up the shipment in question.

When Howard Stores, Inc., in the latter part of March informed Newtowne that it had not received the shipment, an investigation was immediately instituted by the parties concerned. Not until then was Lovecchio aware that the driver had signed the printed name "Chase" to the bills of lading and the shipping book. This was

---

1. In this detail Lovecchio was corroborated by the testimony of Dorsey, one of the drivers for Holland Transportation Company, who testified that the first time he called for a shipment at Newtowne Lovecchio, not being familiar with his face, would not entrust him with the goods until he had called up Holland and they had sent down another man to identify him.

the only time any such name had appeared in Newtowne's records as a purported driver for Holland. A few days after the loss was reported Holland arranged a line-up of twenty-five of its drivers to enable Lovecchio to pick out if possible the driver who had taken away the shipment in question. Lovecchio recognized several of the drivers as familiar faces but was unable to identify which one picked up the shipment. Another of Holland's drivers, one Russell, was not present at the line-up due to illness, but Lovecchio testified that he knew Russell and was unable to identify him as the driver who had picked up the shipment on March 6, 1947. Lovecchio explained that nothing occurred out of the ordinary routine which would have led him to take special note of the driver; that all he could recollect after the event was that the driver had a familiar face as one who had made calls for Holland previously, but beyond that Lovecchio could not identify him. For the most part he did not know the drivers by name; it might have been any one of the Holland drivers who had been there before.

Holland Transportation Company introduced testimony to the effect that it received no telephone call from Newtowne on March 6, 1947; that its records contained no reference to any shipment of the description of the four missing cases of raincoats; that Holland had at no time had any person named "Chase" in its employ; that no tractor-trailer unit of Holland was unaccounted for or in unauthorized hands during the afternoon of March 6, 1947; that no one of Holland's drivers who had previously called at Newtowne and who were assigned to a tractor-trailer unit on that date had called at Newtowne on that day; that the driver Russell, who had not been present at the line-up of drivers above referred to, did not work for Holland on the particular day, March 6, 1947, and further, did not drive a tractor-trailer for Holland but, rather, a small truck.

One Wilhelm, claim agent for the carrier, testified that after examining Holland's records and personnel with completely negative results, he went down to Newtowne's plant to investigate further the alleged claim of loss. He had a conversation with Newtowne's president Selib. The evidence is in some conflict, but taking the testimony most favorable to Newtowne Selib showed Wilhelm the shipping book, the bills of lading, and the invoices, and gave him photostatic copies of these documents for the purpose of supporting a claim of loss which he had made orally. These documents would of course serve to identify the shipment which was claimed to be lost, the consignee, and the value of the goods in question. Holland had blank forms for the making of formal claims of loss, but Wilhelm did not submit any such form to Selib or request him to put in a written claim. It is undisputed, and was conceded by counsel for Newtowne in the trial, that Newtowne never "made a claim on Holland in writing" demanding payment for the loss. Wilhelm told Selib at the time of their conference, and maintained consistently thereafter, that Holland had never received delivery of the shipment in question, was not responsible for the loss, and would not pay the claim. There was nothing in Selib's testimony to the effect that it was this unequivocal denial of liability on the merits of the claim that led Newtowne to omit the formal step of submitting to the carrier a claim in writing.

The district court submitted five special interrogatories to the jury for a special verdict.

In the first question they were asked: "Was the merchandise in fact delivered by the plaintiff to the Holland Transportation Company, Inc., its agents or employees, for transportation to the Howard Stores, Inc.?". The jury's answer to this question was "Yes"; and under the charge to the jury they were permitted to bring in an affirmative answer if they found upon a fair preponderance of the evidence that Newtowne had delivered the goods to "a person actually or apparently authorized to receive such goods on behalf of Holland for transportation in accordance with the bill of lading"—the distinction between actual and apparent authority being explained to the jury in conventional terms.

The second question put to the jury was: "Did Wilhelm, claims agent for the Holland Transportation Company, by words or conduct, induce the agents of the plaintiff not to file a claim in writing with Holland for the loss of the merchandise?". The jury's answer to this question was "No"; and in view of this negative answer they were not required to bring in answers to the remaining three questions which dealt with further aspects of the issue of estoppel.

As above stated, in the light of the special verdict the district judge gave judgment for Newtowne in the original complaint against North America, and gave judgment for Holland on the third-party complaint of North America against the carrier.

First, we shall dispose of the appeal in No. 4514, in which Holland Transportation Company is the appellee.

■ The contract of carriage in question was a uniform domestic straight bill of lading covering an interstate shipment subject to the provisions of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. Section 2(b) of the bill of lading provided: "As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier issuing this bill of lading, or carrier on whose line the loss, damage, injury or delay occurred, within nine months after delivery of the property * * * or, in case of failure to make delivery, then within nine months after a reasonable time for delivery has elapsed".

What constitutes a claim "in writing" within the meaning of the bill of lading provision, and whether there may be a "waiver" or an "estoppel" dispensing with the necessity of compliance with such a condition, are federal questions on which the Supreme Court of the United States has the final word. Georgia, Florida & Alabama Ry. Co. v. Blish Milling Co., 1916, 241 U.S. 190, 195, 36 S.Ct. 541, 60 L.Ed. 948; St. Louis, Iron Mountain & Southern Ry. Co. v. Starbird, 1917, 243 U.S. 592, 595, 596, 37 S.Ct. 462, 61 L.Ed. 917; Chesapeake & Ohio Ry. Co. v. Martin, 1931, 283 U.S. 209, 213, 51 S.Ct. 453, 75 L.Ed.

983. It is settled that such time limitations upon the filing of claims are reasonable and authorized by law. Chesapeake & Ohio Ry. Co. v. Martin, supra, 283 U.S. at page 212, 51 S.Ct. at page 454, 75 L.Ed. 983. It is also well settled, and certainly is fairly obvious, that a mere oral notice of claim cannot be deemed a substantial compliance with the requirement of a claim "in writing". St. Louis, Iron Mountain & Southern Ry. Co. v. Starbird, supra, 243 U.S. at page 606, 37 S.Ct. at page 468, 61 L.Ed. 917; Baltimore & Ohio R. R. Co. v. Leach, 1919, 249 U.S. 217, 39 S.Ct. 254, 63 L.Ed. 570; Olson v. Chicago, B. & Q. R. R. Co., 8 Cir., 1918, 250 F. 372, 375; Manby v. Union Pacific R. R. Co., 8 Cir., 1926, 10 F.2d 327, 329. Cf. Empire Box Corp. v. Delaware, L. & W. R. R. Co., 2 Cir., 1948, 171 F.2d 389, 6 A.L.R.2d 874.

■ In the leading case of Georgia, Florida & Alabama Ry. Co. v. Blish Milling Co., 1916, 241 U.S. 190, 36 S.Ct. 541, 545, 60 L.Ed. 948, the Court took a somewhat indulgent view as to what constituted the filing of a claim "in writing". It held that the document need not be "in a particular form" since the condition "is addressed to a practical exigency and it is to be construed in a practical way." 241 U.S. at page 198, 36 S.Ct. at page 545, 60 L.Ed. 948. In that case, in view of prior correspondence between the shipper and carrier, it was held that the shipper had satisfied the requirement of a claim in writing by sending a telegram to the carrier a few days after the alleged loss of the goods stating: "We will make claim against railroad for entire contents of car at invoice price. Must refuse shipment as we cannot handle." The Court pointed out that in the preceding telegrams which had passed between the parties "the shipment had been adequately identified, so that this final telegram, taken with the others, established beyond question the particular shipment to which the claim referred, and was in substance the making of a claim within the meaning of the stipulation,—the object of which was to secure reasonable notice." But in the case at bar, the documents which Newtowne presented to the carrier's claim agent all antedated the alleged loss; they

did not show on their face the happening of any loss which might be the subject of a claim. Their presentation to the claim agent cannot be deemed a substantial compliance with the requirement of a claim "in writing" which, at the minimum, we think, must be a written document, however informal in expression, indicating an intention on the shipper's part to claim reimbursement from the carrier for a loss asserted to have occurred in the past, and sufficiently identifying the shipment in question either on the face of the document or by reference to previous correspondence between the parties. Cf. Bronstein v. Payne, 1921, 138 Md. 116, 113 A. 648; United Mutual Fire Ins. Co. v. Railway Express Agency, Inc., 1948, 323 Mass. 354, 82 N.E.2d 215; Watts v. Southern Ry. Co., 1926, 139 S.C. 516, 138 S.E. 290.

With respect to other types of contracts, particularly contracts of insurance, the courts have shown a readiness to excuse the nonperformance by the promisee of conditions of this sort, in view of conduct by the promisor deemed to be a "waiver" of such compliance, or deemed to "estop" the promisor from defending on the nonperformance of the condition. For example, if before the time for performance of the condition the promisor flatly states to the promisee that he will not perform the promise in any event, the promisee may be permitted to enforce the promise without performance of the condition. 3 Williston on Contracts (Rev. ed. 1936) § 698A; Restatement of Contracts § 306. But the precedents pretty generally are against such dispensations in case of carriers subject to the Interstate Commerce Act, in line with the basic policy of the legislation requiring carriers to avoid discrimination among shippers. In Georgia, Florida & Alabama Ry. Co. v. Blish Milling Co., 1916, 241 U.S. 190, 197, 36 S.Ct. 541, 544, 60 L.Ed. 948, the Court said: "But the parties could not waive the terms of the contract under which the shipment was made pursuant to the Federal act; nor could the carrier by its conduct give the shipper the right to ignore these terms which were applicable to that conduct, and hold the carrier to a different responsibility from that fixed by the agreement made under the published tariffs and regulations. A different view would antagonize the plain policy of the act and open the door to the very abuses at which the act was aimed."

To the same effect see Southern Pacific Co. v. Stewart, 1919, 248 U.S. 446, 39 S.Ct. 139, 63 L.Ed. 350; Davis v. Henderson, 1924, 266 U.S. 92, 45 S.Ct. 24, 69 L.Ed. 182; Chesapeake & Ohio Ry. Co. v. Martin, 1931, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983; Bronstein v. Payne, 1921, 138 Md. 116, 120, 113 A. 648. The strictness with which the policy of the legislation is adhered to may sometimes make hard cases, and sometimes it is the carrier that suffers by the strictness. See Midstate Horticultural Co., Inc. v. Pennsylvania R. R. Co., 1943, 320 U.S. 356, 64 S.Ct. 128, 88 L.Ed. 96; Empire Box Corp. v. Delaware, L. & W. R. R. Co., 2 Cir., 1948, 171 F.2d 389, 6 A.L.R.2d 874. Hopper Paper Co. v. Baltimore & Ohio R. R. Co., 7 Cir., 1949, 178 F.2d 179, seems perhaps out of line with the other cases; but there at least the carrier knew that the loss had occurred during transportation on its line and had so advised the shipper by telegram. In the present case the carrier's stated position was that it had no record of having accepted any such shipment, that it had no knowledge of the loss, and no responsibility for it if it occurred. Even though Newtowne might previously have made an oral claim upon the carrier, it does not follow that the carrier would necessarily be aware of the shipper's determination to press the claim to litigation after being informed of the carrier's disclaimer of responsibility as the result of investigation. It would not have been unduly burdensome upon Newtowne, and there was ample time remaining after such disclaimer, to make a written demand upon Holland as a condition precedent to bringing suit.

We do not overlook the reservation in Chesapeake & Ohio Ry. Co. v. Martin, 1931, 283 U.S. 209, 222, 51 S.Ct. 453, 458, 75 L.Ed. 983: "Whether under any circumstances the shipper may rely upon that doctrine [estoppel] in avoidance of the time limitation clause of the bill of lading, we

need not now determine." But assuming, without deciding, the possibility of estoppel in a case like the present, the foundation of an estoppel is lacking in view of the negative answer by the jury to the second question submitted to it by the court, which establishes, for present purposes, that the carrier did not by words or conduct induce the shipper to refrain from filing a claim in writing.

We therefore hold that the district court committed no error in giving judgment for the Holland Transportation Company, third-party defendant in No. 4514.

There remains for discussion the appeal in 4513. Here also we hold that the district court committed no error; we think judgment was properly entered for Newtowne on its complaint against North America.

Appellant's basic point is that the loss here was not within the coverage of the transportation policy. Alternatively, North America argues that if the loss was within the policy coverage, Newtowne forfeited its right to recover on the policy, because in failing to make a claim in writing on Holland Transportation Company within the period specified in the bill of lading Newtowne allowed its claim against the carrier to lapse (as we have held in No. 4514, contrary to North America's contentions there), and thus effectively blocked the insurance company's right of subrogation.

The first of these points is based upon much too narrow a reading of the insurance policy. It is hardly necessary to cite authority for the familiar proposition that in construing an insurance policy every rational intendment is made to effectuate the main design of the parties, and that in case of ambiguity, since the language of the policy is drawn by the insurance company in the light of wide experience and with the aid of highly skilled advisers, the equivocal language should be construed most strongly against the insurance company. Koshland v. Columbia Ins. Co., 1921, 237 Mass. 467, 471, 472, 130 N.E. 41; Fuller v. Home Indemnity Co., 1945, 318 Mass. 37, 42, 60 N.E.2d 1. The

transportation policy insured Newtowne against loss from various risks, including theft or pilferage, "only while the property insured is in the custody of:

(a) Any railroad * * *

(b) Public truckmen * * *

This insurance attaches on all shipments described herein, made during the period insured from the time the goods leave the factory, store or warehouse at initial point of shipment, and covers thereafter continuously, in due course of transportation, until same are delivered at store or warehouse at destination."

North America argues that the district court erred in permitting the jury to find that the merchandise was in fact delivered by plaintiff to Holland Transportation Company, if the jury were satisfied upon a preponderance of the evidence that the goods were delivered to "a person actually or apparently authorized to receive such goods on behalf of Holland". It is said that this doctrine of apparent authority is all right as applied to the relationship of shipper and carrier, because of the element of reliance by the shipper upon a manifestation by the carrier in the consensual transaction between them; but that as between Newtowne and North America, the contract of insurance, under which North America agreed to indemnify the shipper for losses only while the property insured was "in the custody of" a public truckman, must be interpreted as covering the merchandise only after it has been delivered to a public truckman or to a person "actually authorized" by the public truckman to receive delivery on his behalf. However, we think this language should be read as implying the application of ordinary principles of agency in determining when goods have been delivered into the "custody" of a public truckman. The shipper here was not content to rely upon the sole responsibility of the common carrier, and took out the transportation policy as a double protection. This being the objective, it seems to us that a reasonable businessman in the shipper's position would naturally read the language of the insurance policy as coincidentally giving him that additional protection as soon as the shipper makes such a de-

livery of the goods as would, under ordinary principles of agency, render a public truckman responsible for the safe carriage and delivery of the goods. Cases like Starlight Fabrics, Inc. v. Glens Falls Ins. Co., 1948, 297 N.Y. 426, 79 N.E.2d 812, are distinguishable, for there a complete impostor, without authority or apparent authority, palmed himself off as an agent of the trucking company; the goods were not in legal effect delivered into the custody of a public truckman, and the trucking company for which the impostor purported to act never became responsible for the safe carriage of the goods.

A related argument by North America in support of the proposition that the risk never attached in this case is based upon the language of the policy stating that the insurance attaches "from the time the goods leave the factory * * * at initial point of shipment, and covers thereafter continuously, in due course of transportation * * *." It is said that this language implies "movement away from the terminus; until that movement begins, the risk does not attach." North America says that from the testimony of plaintiff's own witness Lovecchio, the only rational inference is that the driver who signed the name "Chase" to the bills of lading must have come to the plaintiff's factory with the predetermination to steal the goods; that on that assumption the theft must have occurred prior to the movement of the truck away from the factory premises; that therefore as a matter of law the risk did not attach, since it could not be found that the loss occurred after the goods had "left" the factory "in due course of transportation". For this reason North America urges that it was entitled to a directed verdict. We understand that this particular argument does not depend upon any distinction between actual and apparent authority; and that if the argument were accepted it would apply even if it were assumed that the driver who signed the name "Chase" was in fact sent by Holland to pick up the shipment on Holland's behalf.

It was of course not a necessary part of Newtowne's case to establish that the goods had been stolen by anybody. It was enough for Newtowne to show that the goods were delivered into the custody of a public truckman, that they did not arrive at destination, and that their whereabouts cannot be accounted for. Perhaps it is true that the most reasonable inference from Lovecchio's testimony is that the goods were stolen by the driver who signed the name "Chase", but we doubt whether it would have to be inferred as a matter of law that such driver came to Newtowne's premises with the already formed purpose of making away with the goods. Passing that difficulty with appellant's argument, let it be assumed that the driver, whether actually or only apparently authorized by Holland to pick up the goods, came to the factory with the determination to steal the goods. Making that assumption, it might be a matter of some difficulty to determine just at what point of time the crime was committed. Cf. Commonwealth v. Ryan, 1892, 155 Mass. 523, 30 N.E. 364, 15 L.R.A. 317. We do not undertake to say whether the crime was complete when the goods were loaded on to the truck, or when the shipping clerk Lovecchio relinquished control of the goods to the driver upon the latter's signing of the bills of lading, or when the driver began the asportation of the goods in driving away from the factory. The interpretation of the insurance policy does not depend upon the subtleties of the crimes of larceny and embezzlement. The goods "left" the factory when they were taken outside and loaded in the waiting truck. When Newtowne surrendered control of them upon the signing of the bill of lading, the goods then came into the custody of the public truckman, and from that point of time were subject to transportation risks. If just as the driver was about to put the truck in motion it had been smashed into by another truck and the goods damaged, such loss would have been covered by the transportation policy. The policy was quite clearly intended to include a loss due to dishonesty of the carrier's agents after the goods had been delivered into the custody of the carrier for transportation, and liability on the policy could hardly have been intended to depend on an inquiry into the driver's state of mind to determine just

when he conceived the idea of making off with the goods. That would hardly be a practical interpretation of the business contract. Quite apart from when the crime was complete for purposes of the criminal law, from the practical viewpoint of the businessman Newtowne lost the goods when the driver drove away from the factory and disappeared.

Appellant's remaining contention can be briefly disposed of. In support of its proposition that Newtowne forfeited its right under the policy by its failure to file with the carrier a claim "in writing" within the period stipulated in the bill of lading, North America relies upon conditions (6) and (10) of the transportation policy.

Condition (6) provided: "Warranted by the Assured that this insurance shall not enure directly or indirectly to the benefit of any carrier, bailee or other party, by stipulation in bill of lading or otherwise, and any breach of this warranty shall render this policy of insurance null and void." It is argued that since North America is not able to recover against Holland, "Holland indirectly benefits from the insurance, for it is relieved from liability to pay for a loss for which it would otherwise be responsible." But Holland has received no benefit from the insurance policy directly or indirectly. Holland has not been relieved of liability because of the insurance policy, but because the shipper failed to comply with a condition precedent in the bill of lading; whether Newtowne recovers against North America does not affect Holland's liability one way or the other. The situation sought to be guarded against in condition (6) is the familiar one where a clause in a bill of lading stipulates that any recovery by the shipper on a policy of insurance shall act to reduce or extinguish the carrier's liability.

Condition (10) of the transportation policy provided: "Any act or agreement by the Assured, prior or subsequent hereto, whereby any right of the Assured to recover the full value of, or amount of damage to, any property lost or injured and insured hereunder, against any carrier, bailee or other party liable therefor, is released, impaired or lost, shall render this policy null and void, but the insurer's right to retain or recover the premium shall not be affected. This Company is not liable for any loss or damage which, without its consent has been settled or compromised by the Assured." Construing this condition most strongly against the insurance company, as should be done, we think it refers only to affirmative acts by the insured impairing the insurer's right of subrogation, and does not refer to mere nonfeasance by the shipper whereby a right to recover against the carrier is allowed to lapse, as where the shipper fails to file with the carrier a claim in writing, or fails to institute suit against the carrier, within the time stipulated in the bill of lading. This interpretation is all the more justified when consideration is given to condition (9) in the transportation policy reading: "It is expressly agreed that *upon payment of any loss* or advancement or loan of moneys concerning the same, that the Assured will *at the request and expense of the Company,* and through such counsel as the Company may designate, *make claim upon* and institute legal proceedings against any carrier, bailee, or other parties believed to be liable for such loss, and will use all proper and reasonable means to recover the same." [Italics added.] Under condition (9) the insurer has no standing to demand that the shipper "make claim upon" the carrier until the insurer has paid the shipper for the loss. In the present case, North America has never paid Newtowne for the loss. Furthermore, after Newtowne had made claim upon North America for payment of the loss under the transportation policy, North America informed Newtowne, under date of May 23, 1947, that it had determined, after a thorough investigation of the alleged loss, that there was no evidence that the merchandise in question had been delivered into the custody of a public truckman, therefore "we respectfully decline claim for this loss." At this date, Newtowne still had several months within which it might have filed a claim in writing against the carrier under the terms of the bill of lading. But in flatly disclaiming any liability under the policy, North America in effect said to Newtowne: "We have no

interest in any claim which you may have against Holland, and we don't care what you do or fail to do in connection with such claim." Therefore, even if the seasonable filing by Newtowne of a claim in writing against Holland could be construed, under the language of the insurance policy, as a condition precedent to Newtowne's right to recover against North America, the latter, by reason of its unequivocal and never retracted disavowal of liability on the merits, disbarred itself from setting up such breach of condition as a defense to liability on the policy. See 3 Williston on Contracts (Rev. Ed. 1936) § 698A; Restatement of Contracts § 306.

In each case, the judgment of the District Court is affirmed.