PITMAN MANUFACTURING COMPANY, a Corporation, and A. B. Chance Co., a Corporation (Successor of Pitman Manufacturing Company, a Corporation), Respondents,

v.

CENTROPOLIS TRANSFER COMPANY, Inc., a Corporation, Appellant.

No. 54709.

Supreme Court of Missouri,
Division No. 1.

Dec. 14, 1970.

Rehearing Denied Jan. 11, 1971.

Don M. Jackson, Kansas City, for respondents; Jackson & Sherman, Kansas City, of counsel.

John C. Risjord and Gordon, Adams, Niewald & Risjord, Kansas City, for appellants.

HOUSER, Commissioner.

This is a suit by a manufacturer, Pitman Manufacturing Company and its successor, A. B. Chance Co., both corporations, as as-

signee of its consignee, Standard Auto Body Company, Inc., against an interstate motor carrier, Centropolis Transfer Company, Inc., for damages to certain machinery, equipment and accessories delivered by Pitman to and accepted by Centropolis for interstate shipment from Pitman's Grandview, Missouri plant to the consignee at Los Angeles, California, and damaged or destroyed in transit.

Pitman's petition for damages on which the liability phase of the case was tried was in two counts. Count I sought to establish liability under the provisions of Title 49 U.S.C.A. § 20(11). Count II was based upon negligence. Centropolis' answer admitted delivery of the shipment to defendant under a uniform straight bill of lading, but generally denied and specifically raised the defense that if damage was sustained there could be no recovery for failure to comply with the terms of the bill of lading requiring written notice of claim within nine months of the date of the alleged loss.[1] Both parties filed motions for summary judgment, together with supporting affidavits and depositions. Centropo-lis' motion was overruled. Pitman's motion was sustained and summary judgment was rendered for Pitman on Count I for $33,-655 plus interest. Count II was dismissed. Centropolis appealed.

Centropolis' first point is that the court erred in not sustaining its motion for summary judgment and in entering judgment for Pitman because there is no evidence that a written notice of claim was filed within nine months as required by the bill of lading; that as a matter of law Pitman cannot recover because under the decided cases[2] no written claim was filed with the carrier. Pitman counters with the arguments that there was undisputed evidence of substantial compliance with the requirement and that under the decided cases[3] Pitman is entitled to affirmance of the judgment as a matter of law.

All of the parties agree that shortly after the accident in which the damage occurred Mr. Suddarth, President of Centropolis, and its insurance carrier, Firemen's Fund Indemnity Company, received a report of the happening of the casualty; that

1. Paragraph 2(b) of the bill of lading provided that "As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier issuing the bill of lading, or carrier on whose line the loss, damage, injury, or delay occurred, within nine months after delivery of the property * * * or, in case of failure to make delivery, then within nine months after a reasonable time for delivery has elapsed; * * *. Where claims are not filed * * * in accordance with the foregoing provisions, no carrier hereunder shall be liable, and such claims will not be paid."

2. Anchor Line v. Jackson, 2 Cir., 9 F.2d 543; Central Wholesale Co. v. Chesapeake and Ohio Ry. Co., 366 Mich. 138, 114 N.W.2d 221; B. A. Walterman Co. v. Pennsylvania R. Co., 6 Cir., 295 F.2d 627; Mt. Arbor Nurseries v. American Ry. Express Co., 221 Mo.App. 241, 300 S.W. 1051; Cunningham v. Missouri Pac. Ry. Co., Mo.App., 219 S.W. 1003; Banaka v. Missouri Pac. Ry. Co., 193 Mo. App. 345, 186 S.W. 7; Johnson v. Missouri Pac. Ry. Co., Mo.App., 187 S.W. 282; Johnson & Dealaman, Inc. v. Wm. F. Hegarty, Inc., 93 N.J.Super. 14, 224 A.2d 510; Public Service Electric & Gas Co. v. Reading Co., 17 N.J.Super. 536, 86 A.2d 318; Hossley v. Roadway Express, Inc., Tex.Civ.App., 419 S.W.2d 396; Shulman v. Superior Trucking Co., 3 Conn.Cir. 712, 223 A.2d 407; Appalachian Electric Power Co. v. Virginian Ry. Co., 126 W.Va. 626, 29 S.E.2d 471; Berg v. Schreiber, 337 Ill.App. 477, 86 N.E. 2d 125; Union Pac. R. Co. v. Denver-Chicago Trucking Co., 126 Colo. 581, 253 P.2d 437.

3. Hopper Paper Co. v. Baltimore & O. R. Co., 7 Cir., 178 F.2d 179; Loveless v. Universal Carloading & Dist. Co., 10 Cir., 225 F.2d 637; Georgia, Fla. & Ala. Ry. Co. v. Blish Milling Co., 241 U.S. 190, 36 S.Ct. 541, 60 L.Ed. 948; Chesapeake & Ohio Ry. Co. v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983; Delphi Frosted Foods Corp. v. Illinois Cent. R. Co., 6 Cir., 188 F.2d 343; Insurance Co. of North America v. Newtowne Mfg. Co., 1 Cir., 187 F.2d 675; Northern Pac. Ry. Co. v. Mackie, 9 Cir., 195 F.2d 641.

Mr. Cuddy, claim adjuster for Firemen's Fund, began an investigation within a matter of hours after he received the report; that Centropolis' equipment was sent out to pick up the damaged cargo, remove it from the scene and return it to Pitman's factory; that three days after the accident, on May 24, 1963, Messrs. Suddarth and Cuddy met at the Pitman plant with Jack Smith, counsel and secretary of Pitman, and Dean Broderson, its chief engineer and vice-president, to see what was damaged, discuss the situation, "see about getting things rolling" and "discuss the claim in general." While there all four men inspected and discussed the damaged and destroyed items, and Mr. Broderson, an engineer, answered Mr. Cuddy's and Mr. Suddarth's questions. (Prior to the meeting Mr. Suddarth had a telephone conversation with Jack Smith the nature of which was "that there was a claim or there was damage and we would get the thing taken care of.")

Jack Smith's affidavit recites " * * * that on May 21, 1963, a truckload of products manufactured by Pitman and consigned to Standard Auto Body Company, Inc., of Los Angeles, California, f. o. b. the Pitman plant in Grandview, Missouri, was damaged by reason of a truck owned by Centropolis Transfer Company, on which such products were being transported, having been driven into a railroad underpass in which there was not sufficient clearance for the load; that immediately following this accident, all damaged products were removed from the scene and returned to the Pitman premises; that he was thereafter authorized and instructed by Standard Auto Body Company, to whom title had passed under the f. o. b. sale arrangement, to act for and in its behalf in processing and settling the claim for damages against Centropolis.

"That within a few days following this accident, he had a conference in his office at Pitman Manufacturing Company with Marvin Cuddy of Fireman's Fund, insurance carrier for Centropolis, and with D. R. Suddarth, President of Centropolis, concerning the handling of the claim for damage to these products; that during this conference affiant advised both Mr. Cuddy and Mr. Suddarth that claim was made for the total loss of the products, including the profit factor to Pitman, and that the claim was not limited to the cost of manufacturing; that during this conference, affiant and another executive of Pitman, Mr. Broderson, who was also present, delivered to Mr. Cuddy and Mr. Suddarth the complete file covering the products and containing all invoices, all memoranda covering the load and cost of manufacture, together with all bills of lading; that Mr. Cuddy went through all the written documents so presented to him and made extensive notes concerning all the items at the time; that the contents of the file delivered to him at that time contained and covered the complete claim of damage to the products; that during the same conference and after the written file was reviewed, Mr. Cuddy made an offer to pay the full manufacturing costs in settlement of the claim, which offer was thereupon refused.

"That when the offer was refused, Mr. Cuddy stated that, in order to reduce the amount of the claim, his company desired Pitman to build a fence around the material and to use as much of it as could be used in the building of other equipment in order to reduce the claim by salvage; that following the request so made, Pitman did proceed to segregate the products, build a fence around it, and to salvage such parts as could be so used; that he thereafter continued as Secretary of the corporation until he terminated June 1, 1964, during which time he frequently conferred with Mr. Cuddy with reference to the progress of the salvage and the final amount of the net claim, several thousand dollars worth of salvage having been accomplished prior to the time that he left the employ of this corporation.

"That, to his best knowledge and belief, the file delivered by him to Mr. Cuddy and Mr. Suddarth at the time of the conference shortly after the occurrence of this acci-

dent contained full and complete information, in writing, concerning the identity of all products involved in the accident and thereby damaged; that the written information so furnished the defendant and its insurance adjuster was presented to them, at their request, as written claim for the damage, the exact amount of the loss being the only thing at that time undetermined, pending ultimate salvage figures."

Dean Broderson's affidavit, which confirms that of Jack Smith, more particularly described the file delivered to Messrs. Cuddy and Suddarth as "the complete file covering the products, including written invoices to [the consignee] and written memoranda covering the products contained in this load, together with the bill of lading" and stated that the written documents contained "a full, complete and accurate statement of the value of the three PC–5 Hiliners in the load so damaged and destroyed" and "that such written documents constituting the claim were physically delivered to Mr. Cuddy at the time."

Jack Smith by deposition testified that the file was "presented" to Mr. Cuddy, who made a penciled list of the items in the shipment, on which he wrote quantities and descriptions; that Mr. Cuddy made notes from the file at a desk and asked how much was involved; that the Pitman representatives stated that the invoices on the three major units added up to $40,000 and they estimated the total at perhaps $45,000; and that Mr. Cuddy looked at the invoices. Mr. Smith testified that it was possible that copies of the three invoices for the large amounts (each in the sum of $13,289.60) were given to Messrs. Suddarth and Cuddy to keep; that he thought they received them but was not certain and finally testified that he did not recall one way or the other.

Mr. Broderson's deposition verified the fact that at the conference of May 24, 1963 the file was put before Messrs. Suddarth and Cuddy so they could read it; that they looked at it and questioned what was meant by list price and net price; that Mr. Cuddy took notes on the contents of the file presented to him.

In his deposition Mr. Cuddy conceded that at the conference someone mentioned the figure of $40,000 to $50,000; that they reached an understanding that Pitman would salvage; that the gist of what Pitman said was "We will salvage it and you pay us the net loss"; that the time element involved in salvage was not mentioned; that there was a general discussion about cost price as against sale price; that he anticipated receiving a claim; that he left the meeting with a request for information to be supplied later; that at his office he made a claim file and assigned it a number; that he had his company establish reserves for the payment of the claim, knowing that it would be a substantial claim; that for a period after the conference Mr. Cuddy tried "every week or so" to make contact with Pitman officials by telephone with respect to the claim; that he received the information by telephone from Mr. Smith during the latter part of May, 1963 that the selling price figure on each of the three destroyed Hi-Liner units was $13,-289.60; that numerous efforts on Mr. Cuddy's part during the ensuing months resulted in failure to make contact with Pitman officials; that Mr. Smith was engaged in labor negotiations and was either busy or out of town a great deal of the time; that in August Mr. Cuddy investigated at the Pitman plant to see whether the undamaged fenced-in parts were actually being used as salvage, in an effort on his part to expedite the use of these parts. Finally in November, 1963 Mr. Cuddy wrote a letter to Pitman asking when they "could sit down and discuss this claim in detail." Mr. Cuddy testified that his purpose was "to stay in control of the claim, if possible, to stay on top of it"—"to bring this claim to a conclusion, get the matter squared away"—"to determine the amount of the loss that they would have and make claim against us for." He needed documents "to substantiate and support the claim"; he

did not have enough information to "settle the claim"; that to "conclude the claim" he had to have the dollar amount of the damage, the salvage value and the labor in salvage or reconstruction. In the early part of 1964 Messrs. Cuddy and Smith had lunch together at which time Smith said "it looked like it was in the neighborhood of $40,000"; that he had the figures at the office and that Cuddy would get those figures at a tentative meeting to be set up in the future, but which never materialized.

After Mr. Smith left Pitman in June, 1964 the matter was turned over to a Mr. Sperry who telephoned Mr. Cuddy and stated that "they were anxious to consummate the matter." Mr. Cuddy said "We are also" so they agreed to meet and did meet at Mr. Sperry's office on July 23, 1964. Together they went over the file and discussed the case, considered sheets showing in detail the parts that were salvaged and their cost, bills of lading, copies of invoices, etc. The next day Mr. Sperry provided documentation requested by Mr. Cuddy "in order to complete the claim," including a memorandum prepared on February 14, 1964 by Mr. Sperry at Mr. Smith's request setting forth in detail the various components of the claim. On July 24, 1964 Mr. Sperry for Pitman prepared and by certified mail sent to Firemen's Fund, attention Mr. Cuddy, a formal letter of claim to which were attached nine sets of supporting papers. A few days later Pitman received a letter denying liability and for the first time claiming that Pitman had not complied with the bill of lading.

■ The sufficiency of the notice of claim in interstate shipments is a matter of federal law controlled by federal statutes and decisions. Georgia, Fla. & Ala. Ry. Co. v. Blish Milling Co., 241 U.S. 190, 36 S.Ct. 541, 60 L.Ed. 948; Chesapeake & Ohio Ry. Co. v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983; Northern Pac. Ry. Co. v. Mackie, 9 Cir., 195 F.2d 641.

Under federal law the foregoing facts, if shown by unassailable proof, would establish Pitman's right to judgment as a matter of law. The latest expression of the federal law applicable to the particular fact situation before us is the case of American Synthetic Rubber Corp. v. Louisville and N. R. Co., (1970) 6 Cir., 422 F.2d 462, in which the Sixth Circuit Court of Appeals reversed a district court judgment dismissing an action against a carrier for damages resulting from misdelivery of chemicals on the ground that consignee had not filed a claim in writing with the carrier within nine months as required by § 2(b) of the bill of lading. In that case, after receiving notice of the error, L & N officials visited plaintiffs' plant to investigate the circumstances, where they were made aware that damage was being claimed on account of the misdelivery, although the extent of the damage had not been ascertained. L & N officials acknowledged the existence of plaintiffs' claim and admitted liability. At that time two documents (business records) were presented to the L & N officials, reciting in essence that the railroad had made a misdelivery in that ethylene oxide had been delivered rather than butadiene. After the documents were examined "on the spot" by the railroad officials they were handed back to plaintiffs' representatives. More than nine months after this meeting plaintiffs submitted a "Memorandum of Facts" to the carrier, outlining the extent of the damages. In upholding this exhibition of documents as a "claim in writing" within the requirement of § 2(b) of the bill of lading, the court said, 422 F.2d, l. c. 468, 469: "Generally speaking, any written document, however informal, which indicates an intention to claim damages and identifies the shipment will be sufficient. Insurance Company of North America v. Newtowne Mfg. Co., 187 F.2d 675 (1st Cir.1951). The documents need not be in a particular form. The requirement of a written claim is addressed to a 'practical exigency and is to be construed in a practical way.' Georgia, Florida & Alabama Ry. v. Blish Milling Co., supra [241 U.S. 190, 36 S.Ct. 541, 60 L.Ed. 948 (1916)]. In accordance with this liberal attitude, the requirement of a claim in writing has been held satisfied

where the carrier had actual knowledge of the damage and had notified the damaged party of the destruction of the shipment, Hopper Paper Co. v. Baltimore & Ohio RR, 178 F.2d 179 (7th Cir.1949); also where the carrier had inspected the damaged property, noting the apparent damage, had acknowledged in writing that damages were sustained by carelessness in transit, and had agreed that a formal claim could be filed when itemized damages were ascertained. Loveless Mfg. Co. v. Universal Carloading & Distributing Company, 225 F.2d 637 (10th Cir.1955).

"With these guidelines in mind, and under the peculiar facts of this case, we are of the opinion that appellants have substantially complied with the requirements of section 2(b). We are not unmindful of our decision in B. A. Walterman Co. v. Pennsylvania RR, 295 F.2d 627 (1961), where we held that compliance with the notice requirement in the bill of lading was mandatory and could not be satisfied either by a verbal claim or by actual notice of the damages received by the carrier. We continue to adhere to that view.

"Here, however, unlike *Walterman,* written documents in support of appellants' claim were actually presented to L & N officials when they visited the plant on April 4 to investigate the damages arising out of the misdelivery. Since the record does not disclose the circumstances which prompted L & N to return those documents to appellants, we do not regard the return of the documents as controlling. Moreover, presentation of the documents as evidence of a claim then being made cannot be viewed in a vacuum but must be evaluated in light of the surrounding circumstances. It must be remembered that the purpose of the notice requirement is not to escape liability but to facilitate prompt investigation.

"According to appellants' uncontroverted affidavit, the L & N representative acknowledged that a claim for damages was being made and that a formal claim would be submitted when the damages were ascertained. The documents presented at that time, although not expressly reciting a claim for damages, clearly reveal the particular shipment to which the claim referred, the railroad's error in routing that shipment, and the source of damages. When these documents are viewed in the context of the surrounding circumstances, they constitute an adequate statement of claim within the requirements of section 2(b)."

Under this late ruling of the court of appeals for the Sixth Circuit, upon a set of facts very closely parallel to the facts in the case before us, and under the cases cited in that opinion, we are obliged to hold that the presentation of the invoices and writings in the Pitman file and their exhibition to the president of the carrier corporation and to the claim agent of its insurer for copying, under the circumstances above described [that is to say where the carrier and its insurer had immediate knowledge of the fact and source of the damage and destruction of the shipment, were aware and by their acts and conduct acknowledged that a claim was being made, established a claim file, assigned it a number and established insurance reserves in anticipation of payment of the claim; were apprised by the invoices, bills of lading and other documents as well as by a physical inspection of the damaged goods as to what particular shipment the claim referred and as to the apparent loss; were shown invoices which stated the dollar value of the principal items of the shipment that were damaged beyond repair or salvage; made an offer of settlement and when it was refused requested that the damages be minimized as far as possible by salvaging the undamaged items of the shipment, and to this end requested that the goods be segregated and fenced off; agreed that the details of the salvage allowance be submitted later, left the net amount of the loss as the only undetermined matter and agreed that the claim be given further consideration when the net loss was finally ascertained] constitutes

substantial compliance with the requirement of § 2(b) of the bill of lading that a claim be filed in writing with the carrier, and therefore there was no error in overruling Centropolis' motion for summary judgment.

Considerations of space forbid a case-by-case analysis of appellant's fourteen citations. While there are points of similarity in each of these cases there are also differentiating factors. None of them so closely recreates the facts of the case here for review as does the case of American Synthetic Rubber Corp. v. Louisville & N. R. Co., supra, which is controlling federal authority in the peculiar factual milieu presented.

Centropolis' second point is that in any event the court erred in sustaining Pitman's motion for summary judgment because there is a controversy as to whether the documents were actually exhibited to Centropolis' president and the insurer's claim representative at the conference of May 24, 1963, and whether the loss was due to the default of Pitman (as to the manner in which the units were loaded, or the failure to warn Centropolis' driver of the height of the load). This point must be sustained.

Summary judgment procedure being an extreme and drastic remedy, must be utilized with great care. A summary judgment is authorized only where "the prevailing party is shown by unassailable proof to be entitled thereto as a matter of law." Civil Rule 74.04(h), V.A.M.R. It may be rendered only where the pleadings, depositions and admissions on file, together with the affidavits, show that there is no genuine issue of material fact. E. O. Dorsch Elec. Co. v. Knickerbocker Const. Co., Mo.Sup., 417 S.W.2d 936, 939. The vital evidential fact upon which the right to summary judgment in this case depends is whether the invoices and other instruments in writing were presented to the officials of the carrier and its insurer at the meeting of May 24, 1963. The affidavits and testimony of the officials of Pitman, if uncontroverted, constitute a showing of this fact by unassailable proof of such presentation, entitling Pitman to judgment as a matter of law under Civil Rule 74.04. The difficulty is that these affidavits and this testimony are not uncontroverted. There is a genuine issue of material fact on this issue which is left unresolved and as to which there is considerable doubt on this record. Mr. Cuddy's affidavit positively states that at the meeting at the Pitman plant "no document, writing or tangible object of any kind was delivered into, his possession or the possession of Mr. Suddarth purporting to be the filing of a claim or in any way concerning the alleged claim or damage"; that from the date of the loss in May, 1963 until July 27, 1964 "neither he nor anyone else on behalf of Centropolis Transfer Company received any document or writing from the Pitman Manufacturing Company or the consignee * * *." Further contradicting the affidavits and testimony of the Pitman officials is Mr. Cuddy's testimony by way of deposition as follows:

"Q Sometime during the discussion did you receive and have turned over to you the bills of lading and the invoices on this equipment?

"A No.

"Q Didn't you ever see that file that day?

"A No.

"Q Isn't it a fact that Smith turned over to you all of the data they had on these particular shipments and these particular items of merchandise?

"A No.

"Q Didn't you see them in the office that day?

"A I don't recall that I did.

"Q What was it that you made notes of then while you were there?

"A What this unit was, what it was designed to do, who it was consigned to.

"Q Where did you get that information?

"A From the discussion.

"Q What records did you use to make notes?

"A A little memo pad.

"Q What records of the company did you use to make notes from?

"MR. RISJORD: He is assuming you used some of their records to make notes rather than your conversation with them.

"THE WITNESS: I don't recall I saw any records."

He further testified, "The best I remember, I didn't see any" (records or invoices). Asked specifically whether they handed the invoices over to him and let him look at them "right then and there" he answered, "I don't recall that they did." He did not remember seeing the invoice. If they did, he had no present recollection of it. He said, "I will have to answer no, to my memory." When asked whether he did not get the dollar figure on the selling price of one of the three main units from invoices seen by him at the meeting of May 24 he answered, "I didn't take it from an invoice * * * I am relatively positive from my mind I didn't see it from an invoice * * * there is really no doubt in my mind." When asked "Can you say under oath you didn't see any invoices on May 24, 1963?" he did say "I can't answer," but finally testified, "To the best of my ability I would say no." Mr. Suddarth in his deposition did not positively deny the fact, but deposed that he did not recall—did not remember—whether a file was turned over to Mr. Cuddy at the meeting. He did not remember personally looking over any papers, invoices, shipping orders, or bills of lading.

" 'A genuine issue of fact exists for the purpose of avoiding a summary judgment whenever there is the slightest doubt as to the facts.' " Maddock v. Lewis, Mo.Sup., 386 S.W.2d 406, 409, quoted with approval in Elliott v. Harris, Mo.Sup., 423 S.W.2d 831, 835. An unresolved genuine issue of material fact remaining in the case, Centropolis is entitled to a trial of the issues and for this reason it was error to sustain Pitman's motion for summary judgment. Smile v. Lawson, Mo.Sup., 435 S.W.2d 325[6]; Stanturf v. Sipes, Mo.Sup., 447 S.W.2d 558[3]; Mound Rose Cornice & S. M. Wks. v. H. Kalicak Const. Co., Mo.App., 454 S.W.2d 603[7]; Wood v. James B. Nutter & Co., Mo.Sup., 416 S.W.2d 635[3]; E. O. Dorsch Elec. Co. v. Knickerbocker Const. Co., supra, 417 S.W.2d, l. c. 938[3].

Judgment reversed and cause remanded.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

SEILER, P. J., BARDGETT, J., and HENLEY, Alternate J., concur.

HOLMAN, J., not sitting.