## M. DEMATTEO CONSTRUCTION CO. and Flatiron Structures Co., LLC, Plaintiffs,

v.

## CENTURY INDEMNITY COMPANY, as successor to the Insurance Company of North America; the Home Insurance Company; the Hartford Fire Insurance Company; and Lumbermans Mutual Casualty Company, Defendants.

### No. CIV.A. 00–12057–WGY.

United States District Court,
D. Massachusetts.

Oct. 3, 2001.

---

**4.** *Macone* was a summary judgment ruling, and thus not authority for dismissing this case on the pleadings.

Eric F. Eisenberg, Lauren Timoney Upton, Doreen M. Zankowski, Hinckley, Allen & Snyder, Boston, MA, for Plaintiffs.

Marie Cheung–Truslow, Gerald W. Motejunas, Lecomte, Emanuelson, Motejunas & Doyle, Quincy, MA, Christopher A. Duggan, Matthew J. Walko, Smith, Duggan & Johnson, Boston, MA, for Defendants.

Garrick F. Cole, Smith & Duggan, L.L.P., Nancy M. Reimer, Donovan Hatem LLP, James A. Sweeney, Attorney General's Office, Boston, MA, for Interested Parties.

## MEMORANDUM

YOUNG, Chief Judge.

### I. Introduction

The plaintiffs, the joint venture of M. DeMatteo Construction Co. and Flatiron Structures Co., LLC ("DeMatteo"), have brought this action against the defendants, The Insurance Company of North America ("North America"),[1] The Home Insurance Company ("Home"), The Hartford Fire Insurance Co. ("Hartford"), and Lumbermans Mutual Casualty Co. ("Lumbermans") (collectively the "Insurers"), alleging that the Insurers failed to pay a claim for an insured loss of $927,968.90 pursuant to a builder's risk insurance policy, under which DeMatteo was an additional insured. DeMatteo asserts claims against the Insurers for breach of contract (Count I) and for unfair insurance claims and settlement practices and unfair and deceptive trade acts and practices in violation of Massachusetts General Laws chapters 176D and 93A (Count II). Am. Compl. ¶¶ 18–26.

On June 29, 2001, the Insurers moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 on both counts of the complaint "based on the

---

1. DeMatteo filed its action against Century Insurance Company (later amended to Century Indemnity Company to correct the misnomer), as North America's "successor in interest." Because no party has raised an objection to North America's participation in this matter, however, this Court has previously deemed North America to be a proper party. Order of Apr. 27, 2001, at 2 n. 2 [Docket No. 27].

Plaintiffs' violation of the insurance policy's subrogation clause and the Plaintiffs' failure to state a claim for violation of Mass. Gen. laws c. 93A and 176D." Defs.' Mot. at 1. After the parties agreed to submit the motion to the Court for consideration on the papers, the Court denied the Insurers' motion as to the breach of contract claim and granted the motion as to the chapters 176D and 93A claims. Order of Aug. 22, 2001 [Docket No. 43]. This memorandum sets forth the reasoning of the Court's order.

## II. Factual Background [2]

### A. The Insurance Policy

As part of the Central Artery/Tunnel Project (the "Project"), DeMatteo entered into a contract with the Massachusetts Highway Department to construct the Interstate I–90 interchange that will connect the Ted Williams Tunnel to Logan International Airport. Am. Compl. ¶ 9.

The insurance needs of the Project are met by a policy (the "Policy") under which the Massachusetts Highway Department and Bechtel/Parsons Brinckerhoff are the named insureds. Defs.' Stmt. ¶ 1. The Policy contains a twenty-four-page manuscript form entitled "Builders Risk Program," which was drafted by the broker/insurance consultant for the Massachusetts Highway Department and Bechtel/Parsons Brinckerhoff, and was ne-

gotiated primarily with the lead insurer, North America. Id. ¶ 2. The manuscript form and the North America policy jacket constitute the "Master Policy." Id. ¶ 3. Home, Hartford, and Lumbermans subscribed to the Master Policy and attached their respective company jackets to it. Id. The terms and conditions of the Master Policy control with respect to all claims. Id.

Under the Policy, the named insureds are the Massachusetts Highway Department, the Massachusetts Turnpike Authority, and Bechtel/Parsons Brinckerhoff. Id. ¶ 4. DeMatteo is an additional insured under the Policy to the extent of its involvement in the Project. Id. ¶ 5.

### B. The Loss and DeMatteo's Claim

On or about July 28, 1997, a pre-existing 120–inch outfall pipe and tidal gate malfunctioned during a particularly high tide. Id. ¶ 7 (quoting Compl. ¶ 11). As a result of this malfunction, millions of gallons of water from Boston Harbor flowed back through the pipe and submerged the Project site where DeMatteo was performing its work under nearly fifteen feet of water. Id.

Immediately following the discovery of the flooded Project site, DeMatteo notified the Insurers of the incident. Newman Aff. ¶ 3. Shortly after this notice, the Insurers' claims adjuster, Steven Downs ("Downs"),

**2.** The facts in this case consist of: (i) the Defendants' Statement of Undisputed Facts ("Defs.' Stmt."); (ii) DeMatteo's Statement of Additional Material Facts ("Pl.'s Stmt."); (iii) affidavit of Steven Downs, the Insurers' claims adjuster, and exhibits comprised of the subject insurance policy and the "Standstill and Non–Waiver Agreement and Reservation of Rights" and amendments thereto; (iv) affidavit of Doreen M. Zankowski, Esq., and exhibits including pleadings, third-party summons, and Joint Stipulation of Dismissal in *Ace American Insurance Co. v. Massachusetts Port Authority;* (v) affidavit of Paul K. New-

man, DeMatteo's project manager, and exhibits including DeMatteo's correspondence and subrogation agreements. The recitation of facts draws from these sources.

The Court may rely on the Defendants' Statement to the extent that no objection has been interposed. *See* Local Rule 56.1 ("Material facts of record as set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties.").

visited the site and met with DeMatteo personnel. *Id.* ¶ 9. DeMatteo conducted an extensive investigation and discovered that the primary causes of the flood were a flood gate that became detached from the outfall pipe and thus failed to prevent the backflow of the tidal surge, *id.* ¶ 4, and substantial gaps in the seams of the outfall pipe that allowed the water to escape the Project site, *id.* ¶ 5. The outfall pipe was owned, operated, and maintained by the Massachusetts Port Authority ("Mass-Port"). DeMatteo shared its findings with the Insurers, and Downs attended at least one meeting at which the findings were discussed. *Id.* ¶¶ 9–10.

In order to reclaim the site and all of the equipment and materials, protect the Project from further damage, and resume its contract work, DeMatteo conducted immediate emergency procedures, including the installation of "stop logs" to replace the missing flood gate and the installation of a steel bulkhead, effectively sealing off the outfall pipe and diverting drainage to dry sections of the pipe. *Id.* ¶¶ 4, 6. DeMatteo also incurred significant costs in repairing the leaking joints of the outfall pipe. *Id.* ¶ 5. These emergency measures and repairs cost DeMatteo $1,041,106.98, for which it submitted a claim to the Insurers.[3] *Id.* Ex. A. The Insurers denied the majority of DeMatteo's claim, offering to pay only $142,767.39. *Id.* ¶ 11. Despite lengthy discussions and additional proofs of loss submitted by DeMatteo, the insurers refused to pay the remainder of DeMatteo's claim. *Id.* ¶ 13.

In exchange for payment of the undisputed amount of $142,767.39, DeMatteo submitted signed subrogation agreements to the Insurers on November 8, 1998. *Id.* ¶ 12 & Ex. B. DeMatteo reserved its rights and continued to seek payment for the remainder of its claim, repeatedly asserting that its claim was covered under the Policy. *Id.* ¶ 13.

## C. The Standstill Agreement

On July 22, 1999, while negotiations continued, DeMatteo and the Insurers entered into a "Standstill and Non–Waiver Agreement and Reservation of Rights" ("Standstill Agreement"). Defs.' Stmt. ¶ 8; Downs Aff. Ex. B. The Standstill Agreement extended the time for DeMatteo to file suit against the Insurers from July 28, 1999 to September 7, 1999. Downs Aff. Ex. B. The Standstill Agreement also preserved all of the Insurers' rights and defenses under the Policy, including their rights of subrogation. *Id.* The parties amended the Standstill Agreement eleven times, extending it to October 6, 2000. *Id.* During this time, the Insurers continued to deny coverage. Pl.'s Stmt. at 3.

## D. Superior Court Action

On July 21, 2000, Home, Lumbermans, and Hartford,[4] as subrogees of DeMatteo, filed an action against MassPort in the Massachusetts Superior Court sitting in and for the county of Suffolk. *Id.* at 3–4; Defs.' Reply Ex. B. On April 5, 2001, the parties to that action filed a Joint Stipulation of Dismissal ("Joint Stipulation"), stating that:

such dismissal shall be without prejudice to any claims, demands, actions, suits, rights, or defenses, in law or in equity, to the extent they exist and are properly raised, that are now or become in the

---

3. DeMatteo notes that the work to reclaim the project site and to protect it from further damage delayed the project by thirty-six days and resulted in extended overhead costs of $602,000.00. DeMatteo included these over-

head costs in its claim. Pl.'s Stmt. at 3 n. 3; Newman Aff. ¶ 7.

4. North America does not appear to have been a party to this action. *See* Zankowski Aff. Ex. B; Defs.' Reply Ex. B.

future the subject of, or are subsequently commenced as a result of a judgment obtained in, the action captioned *M. DeMatteo Construction Co. and Flatiron Structures Co., LLC v. Century Insurance Company, as successor to the Insurance Company of North America; Home Insurance Company; Hartford Fire Insurance Company, and Lumbermans Mutual Casualty Company v. Insurance Company of North America; Home Insurance Company; Hartford Fire Insurance Company; and Lumbermans Mutual Insurance Company v. Massachusetts Port Authority*, Civil Action No. 00–12057–WGY, now pending before the United States District Court for the District of Massachusetts ... of any person or entity joined as a party to the Federal Court action now or in the future.

Zankowski Aff. Ex. B, at 2. Judgment was entered on the Superior Court docket on April 11, 2001. *Id.* at 1.

### E. The Instant Action

DeMatteo filed the instant action on October 5, 2000. Compl. at 1, 5. On December 27, 2000, the Insurers served a third-party complaint on MassPort, asserting that MassPort's failure properly to maintain its tidal gates resulted in the damages sustained by DeMatteo, and seeking declaratory relief that, in the event that DeMatteo was successful in its claims against the Insurers, MassPort would be liable to the Insurers as subrogees of DeMatteo. Am. Third–Party Compl. ¶¶ 16–17. On April 3, 2001, two days before the parties in the state court action filed the Joint Stipulation, MassPort filed a motion to dismiss the third-party complaint, alleging that the statute of limitations had expired for any possible MassPort liability. Pl.'s Stmt. at 4. Following oral hearing on April 26, 2001, the Court granted MassPort's motion to dismiss the third-party complaint because it was filed beyond the three-year statute of limitations for torts under Massachusetts law, Mass. Gen. Laws ch. 260, § 2A. Order of Apr. 27, 2001, at 2 [Docket No. 27].

## III. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate if, after reviewing the facts in the light most favorable to the nonmoving party and drawing all justifiable inferences in favor of the nonmoving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c).

The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is therefore entitled to judgment as matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 15 (1st Cir.1986). If the movant satisfies this burden, then the nonmovant can only survive summary judgment by proffering evidence that supports the existence of a genuine issue of material fact to be resolved at trial. *Donovan v. Agnew*, 712 F.2d 1509, 1516 (1st Cir.1983). The adverse party "may not rest upon the mere allegations or denials of the adverse party's pleading," but rather must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

### B. Prejudice to the Insurers' Right of Subrogation

The Policy contains a subrogation clause, which states:

*SUBROGATION*

If the Company pays a claim under this Policy or its Underlying Declarations Pages, it will be subrogated, to the extent of such payment, to all the Insured's rights of recovery from other persons, organizations and entities. *The Insured will execute and deliver instruments and papers and do whatever else is necessary to secure such rights.*

. . . . .

The Insured will *act in concert* with the Company and all other interests concerned in the exercise of such rights of recovery.

If any amount is recovered as a result of such proceedings, the net amount recovered after deducting the costs of recovery, will accrue first to the Company in proportion to their respective interests. Any excess of this amount will be remitted to the Insured. If there is no recovery, the interests instituting the proceedings will bear the expense of the proceedings proportionately.

*The Insured will do nothing after a loss to prejudice such rights of subrogation.*

Downs Aff. Ex. A, Manuscript Form, at 14–15 (emphasis added). The Insurers argue that this language obligated DeMatteo to preserve the Insurers' subrogation rights by filing suit against the Insurers or MassPort within three years of the loss, or by obtaining an extension of time to file suit against MassPort. Defs.' Mem. at 3–4. The Insurers therefore assert that summary judgment must enter against DeMatteo because DeMatteo filed the instant action on October 5, 2000 and the statute of limitations for filing a tort action against MassPort ran on July 28, 2000. DeMatteo counters that it had no affirmative duty to file suit to protect the Insur-

ers' rights, and that the Insurers prejudiced their subrogation rights through their own actions. Pl.'s Opp'n at 5.

#### 1. Case Law

#### a. Cases Involving Action

To support their position, the Insurers rely heavily upon two cases, *Landgren v. Aetna Life & Casualty Co.*, 366 Mass. 725, 322 N.E.2d 417 (1975), and *Byron v. Nationwide Insurance Co.*, No. Civ. A. 95–1615B, 1998 WL 374919 (Mass.Super. July 2, 1998) (Doerfer, J.), *aff'd*, 50 Mass.App. Ct. 1104, 735 N.E.2d 1278 (2000). In *Landgren*, the motor vehicle liability policy at issue contained a provision that in the event of payment under the policy, the insurer would be subrogated to all the insured's rights of recovery against any other person or organization. 366 Mass. at 726, 322 N.E.2d 417. The policy further provided—in language nearly identical to that at issue in the instant case—that "[t]he Insured shall do nothing after loss to prejudice such rights." *Id.* The Supreme Judicial Court upheld the Appellate Division's conclusion that "the plaintiff had prejudiced [the insurer's] right of subrogation ... against the third party by not making a claim before the statute of limitations foreclosed any action by [the insurer] against the third party or its insurer." *Id.*

The facts undergirding the Supreme Judicial Court's decision are distinguishable from those of the case at hand, however. In *Landgren*, immediately following the loss, the plaintiff filed a loss notice with her insurer which stated that "[i]t appears that [the other party's insurer] will take care of payments to our assured, so no Collision policy claim is being made at this time unless problems arise with [the other party's insurer]." *Id.* This was the *only* notice that the plaintiff sent to her insurer during the two-year period that the insurer had a right to sue the third party. *Id.*

The plaintiff filed a claim with her insurer only after the two-year period during which the insurer could have pursued its right to subrogation had expired. *Id.* The Supreme Judicial Court therefore concluded that the plaintiff's notice reasonably led her insurer to conclude that she was not asserting any rights under her collision coverage and that this representation amounted to "*affirmative action* which, coupled with the plaintiff's delay in presenting her claim, prejudiced [the insurer's] right of subrogation and, therefore, precluded the plaintiff from recovery under her policy." *Id.* at 726–27, 322 N.E.2d 417 (emphasis added); *see also id.* at 727, 322 N.E.2d 417 (noting that cases involving no affirmative action by an insured were not on point).

In contrast, in the instant case, DeMatteo never led the Insurers to believe that DeMatteo would not be pursuing its claim for coverage by the Insurers. Indeed, DeMatteo notified the Insurers of its loss at the time it occurred, and continued to pursue its claim doggedly for several years. Newman Aff. ¶¶ 3, 10 & Ex. A. Furthermore, there was no unreasonable delay in the filing of DeMatteo's claim as would unjustly prejudice the Insurers' ability to subrogate, as was the case in *Landgren.* Thus, the conclusions of the Supreme Judicial Court in *Landgren* are largely inapposite to this case.

In *Byron*, a justice of the Massachusetts Superior Court considered whether the insurer had been prejudiced by the insured's late notice of his uninsured motorist claim, which resulted in the insurer's loss of its right to recover as subrogee. 1998 WL 374919, at *1. The court granted summary judgment to the insurer, stating that the

insurer had "shown that actual, material prejudice inured as a result of [the insured's] untimely notice of his uninsured motorist claim." *Id.* at *3. Under the terms of the policy, the insured had an obligation to "do nothing to interfere with [the insurer's subrogation] rights ... [and to] do whatever is necessary to help [the insurer] recover any amount paid." *Id.* at *4. Because the insured had failed to file a claim against the third party before the bar date, the court determined that the insurer had been precluded from any opportunity to litigate its subrogation claim and was prejudiced thereby. *Id.*

*Byron*, like *Landgren*, however, is distinguishable from the instant case. In *Byron*, the fundamental question for the court was whether the insured's failure to comply with the policy's notice provision for more than three years after the accident had actually prejudiced the insurer. The court concluded that the loss of the insurer's subrogation rights constituted "actual, material prejudice." *Id.* at *3. In the case at hand, however, DeMatteo complied with the Policy's notice provision and there was no undue delay in notifying the Insurers of the loss. Therefore, the Insurers themselves had an opportunity to preserve their subrogation rights—an opportunity that was not available to the insurer in *Byron.*[5]

The Insurers also rely upon two Pennsylvania Superior Court cases, *Zourelias v. Erie Insurance Group*, 456 Pa.Super. 775, 691 A.2d 963 (1997), and *Bradford v. American Mutual Liability Insurance Co.*, 213 Pa.Super. 8, 245 A.2d 478 (1968).[6] In *Bradford*, the insurer "conditioned its policy liability on the insured's taking no

---

**5.** It is unclear whether the *Byron* court would have reached the same conclusion if the insurer had been notified properly of the claim and of the potential liability of a third party,

yet failed to take measures to protect its subrogation claim.

**6.** *Zourelias* will be discussed in the following section.

action to defeat or diminish the insured's right of recovery upon which the insurer's right of subrogation depends." 245 A.2d at 480. The policy required that the insured "do nothing after loss to prejudice such rights." *Id.* at 479. The court therefore concluded that the insured's settlement and release of the third party from liability, without the knowledge or consent of the insurer, relieved the insurer of its contractual obligation to pay, because the insured's release of the tortfeasor had made it impossible for the insured to comply with the policy's subrogation clause. *Id.* The Court noted that the insured was "not entitled to a double recovery of medical expenses" from both his insurer and the tortfeasor. *Id.*

*Bradford* is not precisely parallel to the instant case, however. In *Bradford,* the court focused on barring the insured from a double recovery of damages from both his insurer and the tortfeasor, and on the insured's "action" after the loss that prejudiced the insurer's right of recovery. *Id.* at 480. The court concluded that the insured's settlement and release of the tortfeasor from liability constituted an "action" that barred the insured's right of recovery upon which the insurer's right of subrogation depended. *Id.* Thus, the insurer's right of subrogation was defeated by an *affirmative act* of the insured, in direct contravention to the express terms of the policy. In contrast, the Insurers here complain of DeMatteo's *inaction*—allowing the statute of limitations for bringing a tort action against MassPort to run.[7]

### b. Cases Involving Inaction

Because the question for this Court is whether DeMatteo's failure to take affirmative action to preserve its potential tort action against MassPort constitutes a failure to comply with a material condition of the Policy that relieves the Insurers of liability under the Policy, cases in which the insured took no affirmative action prejudicing the insurer's right of subrogation are of greater assistance to the Court.

In the second Pennsylvania Superior Court case cited by the Insurers, *Zourelias*, the policy contained a "trust agreement" clause, which provided that:

> When we pay anyone under these coverages, they will (1) repay us out of any damages recovered from the legally liable party . . . ; (2) hold in trust for us *all* rights of recovery against the other party; (3) do whatever is proper to secure these rights, and do nothing to harm them . . . .

691 A.2d at 965. The insurer contended that this clause protected its right of subrogation and that the insured breached his affirmative duty to protect its subrogation rights by failing to file his cause of action against the third-party tortfeasor before the statute of limitations ran. *Id.* The court determined that "the parties' intent as manifestly expressed in the insurance contract was clear. The 'trust agreement' expressly stated that the insured was obligated to do 'whatever was proper to secure the insurer's subrogation rights' and 'do nothing to harm these rights.'" *Id.* The court then concluded that because the insured did not file his cause of action

---

7. In *Kmonk–Sullivan v. State Farm Mutual Automobile Insurance Co.,* 746 A.2d 1118 (1999), *appeal granted,* 565 Pa. 647, 771 A.2d 1285 (2001), the Pennsylvania Superior Court focused on this action/inaction distinction, and distinguished cases in which "the plaintiff took some action that destroyed the insurers' subrogation rights," *id.* at 1125, from those in which "the insureds did nothing to impair the insurers' right to subrogation," *id.* It is clear from the text of the opinion, however, that the court regarded an insured's failure to file a timely action against a third-party tortfeasor as an affirmative action. *Id.* (citing *Zourelias* ).

against the third party until after the statute of limitations had passed, he was barred from recovery as to the third party and the insured's right of subrogation was destroyed. *Id.* (quoting *Archer v. State Farm Ins. Co.*, 419 Pa.Super. 558, 615 A.2d 779, 783 (1992) ("When an insured nullifies an insurer's ability to enforce its subrogation rights ... the injured party is no longer entitled to recover from the insurer.")).

Thus, in *Zourelias,* a case with policy language and facts similar to the instant case, the court concluded that the insured's failure to preserve the insurer's subrogation action by filing before the running of the statute of limitations barred liability under the policy against the insurer. If *Zourelias* were a Massachusetts case, then this Court's analysis would be truncated. The First Circuit case of *Insurance Co. of North America v. Newtowne Manufacturing Co.*, 187 F.2d 675 (1st Cir.1951) (applying Massachusetts law), however, suggests that the law of this jurisdiction may differ from that of Pennsylvania.

In *Newtowne Manufacturing,* the First Circuit considered whether the insured had "forfeited its right under the policy by its failure to file with the carrier a claim 'in writing' within the period stipulated in the bill of lading," *id.* at 684. The policy provided that:

> An act or agreement by the Assured, prior or subsequent hereto, whereby any right of the Assured to recover the full value of, or amount of damage to, any property lost or injured and insured hereunder, against any carrier, bailee or other party therefor, is released, impaired or lost, shall render this policy null and void, but the insurer's right to retain or recover the premium shall not be affected. This Company is not liable for any loss or damage which, without

its consent has been settled or compromised by the Assured.

*Id.* The court construed "this condition most strongly against the insurance company, as should be done," *id.*, and concluded that it referred "only to affirmative acts by the insured impairing the insurer's right of subrogation," *id.*, not to "mere nonfeasance by the [insured] whereby a right to recover against the carrier is allowed to lapse, as where the [insured] fails to file with the carrier a claim in writing, or fails to institute suit against the carrier, within the time stipulated in the bill of lading," *id.*

Although *Newtowne Manufacturing* 's holding is instructive, it is not dispositive. Notably, the policy language at issue in *Newtowne Manufacturing* differs from that of the case at hand. In *Newtowne Manufacturing,* the policy explicitly referred to an "act or agreement" by the insured. Thus, the First Circuit interpreted this language narrowly to refer only to affirmative acts impairing the insurer's right of subrogation. In contrast, the Policy at issue here specifically states that "[t]he Insured will ... do whatever else is necessary to secure such rights," Downs Aff. Ex. A, Manuscript Form, at 14, which suggests an affirmative duty to preserve the insurer's right of subrogation, not just a duty not to impair that right. *But see Industriales Nicaraguenses Chipirul, S.A. v. Switzerland Gen. Ins. Corp.*, 443 So.2d 1062, 1063 (Fla.Dist.Ct.App.1984) (citing *Newtowne Manufacturing* approvingly, and noting that "the failure to file suit against the [third party], without more, was not an affirmative act of the insured which constituted an impairment of subrogation rights").

In *Robinson v. Auto Owners Insurance Co.*, 718 So.2d 1283 (Fla.Dist.Ct.App.1998), the insurer argued that it was entitled to judgment as matter of law because the

insured had allowed the statute of limitations on her cause of action against the third-party tortfeasor to expire and thus failed to preserve the insurer's subrogation rights. *Id.* at 1284–85. The policy at issue required the insured to "do everything necessary" to preserve the insurer's right of subrogation and to "do nothing to prejudice" that right. *Id.* at 1284. The court concluded that because the policy did not *expressly require* the insured to file a lawsuit against the tortfeasor in order to protect the insurer's subrogation rights, summary judgment was not warranted. *Id.* at 1285.

Similarly, in *Welch v. Automobile Club Inter–Insurance Exchange,* 948 S.W.2d 718 (Mo.Ct.App.1997), the court considered an insurance policy that provided:

A. If we make a payment under this policy and the person to or for whom payment was made has a right to recover damages from another we shall be subrogated to that right. That person shall do:

1. Whatever is necessary to enable us to exercise our rights; and

2. Nothing after loss to prejudice our rights.

*Id.* at 721. The court concluded that under the circumstances of that case, the insured's failure to bring suit against the tortfeasor within the statute of limitations did not preclude her recovery under the policy. *Id.* at 724.

Both *Robinson* and *Welch,* however, as well as the other cases cited by DeMatteo—*Uptegraft v. Home Insurance Co.,* 662 P.2d 681 (Okla.1983), *Selected Risks Insurance Co. v. Dierolf,* 138 N.J.Super. 287, 350 A.2d 526 (1975), and *American States Insurance Co. v. Williams,* 151 Ind. App. 99, 278 N.E.2d 295 (1972)—arose in the context of suits by insured drivers, involved in accidents with uninsured or underinsured motorists, for benefits from their insurers. Thus, the determination of

these courts that the insurers' obligation to pay the claims was not obviated by the insureds' failure to file suit against the third-party tortfeasors within the statute of limitations was strongly influenced by public policy concerns. The courts noted that the statute of limitations on uninsured motorist actions is longer than that for bodily injury actions, and that under state law, the insured is not obliged to sue the tortfeasor as a precondition to seeking uninsured motorist benefits from her insurer. *E.g., Robinson,* 718 So.2d at 1285; *Welch,* 948 S.W.2d at 722–23. In *Uptegraft,* the court observed that "[t]he purpose of an uninsured motorist provision in an insurance contract is to protect the insured from the effects of personal injury resulting from an accident with another motorist who carries no insurance or is underinsured." 662 P.2d at 683–84. Because this policy would be undermined by a holding that the insurer has no obligation to pay under the uninsured motorist coverage of the policy if action against the uninsured tortfeasor was barred by the statute of limitations, *id.,* the cases upon which DeMatteo relies may reflect policy concerns beyond the scope of the contractual language that are not applicable to the instant case, which concerns an unremarkable builder's risk policy.

**2. Contract Interpretation and Considerations of Policy**

As is evident from the cases discussed above, courts disagree as to whether contract language such as that contained in the Policy obligates an insured to take affirmative action to prevent the running of the statute of limitations on its claims against a third-party tortfeasor. *Compare, e.g., Zourelias,* 691 A.2d at 965 (insured must take affirmative action), *with Robinson,* 718 So.2d at 1284–85 (non-feasance does not violate policy). Case law from this jurisdiction is particularly

sparse. The Court therefore turns to rules of contract interpretation and considerations of policy to determine the intent of the contracting parties in this case.

### a. Interpretation of the Policy's Language

Under Massachusetts law, the interpretation of an insurance contract is not a question of fact for the jury, but rather matter of law for the trial judge. *Cody v. Conn. Gen. Life Ins. Co.*, 387 Mass. 142, 146, 439 N.E.2d 234 (1982). When interpreting an insurance contract, the Court is guided by several principles. As with all contracts, insurance contracts are to be construed "according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed." *MacArthur v. Mass. Hosp. Serv., Inc.*, 343 Mass. 670, 672, 180 N.E.2d 449 (1962) (internal quotation marks omitted) (quoting *Koshland v. Columbia Ins. Co.*, 237 Mass. 467, 471, 130 N.E. 41 (1921)). "A policy of insurance whose provisions are plainly and definitely expressed in appropriate language must be enforced in accordance with its terms." *Hyfer v. Metro. Life Ins. Co.*, 318 Mass. 175, 179, 61 N.E.2d 3 (1945) (internal quotation marks omitted) (quoting *Stankus v. N.Y. Life Ins. Co.*, 312 Mass. 366, 369, 44 N.E.2d 687 (1942)). But if the contract is ambiguous, "doubts as to the intended meaning of the words must be resolved against the insurance company that employed them and in favor of the insured." *August A. Busch & Co. v. Liberty Mut. Ins. Co.*, 339 Mass. 239, 243, 158 N.E.2d 351 (1959); *see also Newtowne Mfg.*, 187 F.2d at 684 (noting that policy provision ought be construed "most strongly" against the insurance company).

The language at issue in the case at hand, which states that "[t]he Insured will ... do whatever else is necessary to secure such rights," "[t]he Insured will act in concert with the Company and all other interests concerned in the exercise of such rights of recovery," and "[t]he Insured will do nothing after a loss to prejudice such rights of subrogation," Downs Aff. Ex. A, Manuscript Form, at 14–15, is ambiguous as to the degree of affirmative action required of the insured. It is not clear from the face of the Policy whether the insured has an affirmative duty to act on the Insurers' behalf to preserve the Insurers' right of subrogation against a third-party tortfeasor, or whether the insured is merely obligated not to interfere with the Insurers' pursuit of such a claim. The disparate outcomes of the cases discussed above evidence this ambiguity.

It is the Insurers' obligation, however, not DeMatteo's, to eliminate such ambiguity from the Policy, because the Insurers are better informed about their rights and obligations and are the contracting party with the upper hand. *E.g., Newtowne Mfg.*, 187 F.2d at 684. If the Insurers had wanted to create an affirmative duty for the insured to pursue any claim against a third-party tortfeasor before the running of the statute of limitations, then it would have been simple for the Insurers to write such an obligation into the contract. *See Robinson*, 718 So.2d at 1285 (denying summary judgment to the insurer because the policy at issue did not expressly require the insured to file a lawsuit against the tortfeasor to protect the insurer's subrogation rights). The language of the Policy does not create such an affirmative duty, but rather places on the insured a duty not to *interfere* with the Insurers' right of subrogation. Downs Aff. Ex. A, Manuscript Form, at 14–15 (insured must "act in concert" with the Insurers and "do nothing ... to prejudice [the] rights of subrogation"). Thus, had the Insurers sought DeMatteo's assistance in pursuing a claim against MassPort, DeMatteo would have been obligated to assist the Insurers in that pursuit. *See Uptegraft*, 662 P.2d at 687 n. 12 (speculating that outcome might be different if the "insured refused to heed

the insurer's demand ... to protect its subrogation rights by filing a lawsuit against the ... tortfeasor"). But having utterly failed to pursue such a claim, the Insurers cannot now shift the onus onto DeMatteo to have done so.

Moreover, support for this interpretation of the Policy can be gleaned from the case law. Except in Pennsylvania, *e.g.*, *Kmonk–Sullivan v. State Farm Mut. Auto. Ins. Co.*, 746 A.2d 1118, 1125 (1999), *appeal granted*, 565 Pa. 647, 771 A.2d 1285 (2001); *Zourelias*, 691 A.2d at 965, an insured's mere failure to pursue a tort claim within the statute of limitations does not constitute affirmative action. Rather, courts look for some action on the part of the insured that prejudices the insurer, such as a settlement, release, failure to provide timely notice of the claim, or refusal to bring suit despite the insurer's request that the insured do so. *E.g., Newtowne Mfg.*, 187 F.2d at 684 (affirmative act, not mere non-feasance, required); *Winthrop & Weinstine, P.A. v. Travelers Cas. & Sur. Co.*, 993 F.Supp. 1248, 1256 (D.Minn.1998) (failure to give notice of claim), *aff'd*, 187 F.3d 871 (8th Cir.1999); *Landgren*, 366 Mass. at 726–27, 322 N.E.2d 417 (misleading notice, followed by untimely notice); *Byron*, 1998 WL 374919, at *3–*4 (untimely notice); *Bradford*, 245 A.2d at 480 (settlement and release).

The Court therefore concludes that DeMatteo was not obligated under the Policy to take affirmative action—namely, to file against the Insurers or MassPort within the three-year statute of limitations for tort actions—to preserve the Insurers' subrogation rights.

### b. The Insurers' Culpability

■ Although the Court can conclude on the basis of the Policy alone that DeMatteo was not obligated to take affirmative action to preserve the Insurers' right of subrogation, the Court finds further support for this holding in the conduct of the Insurers. Notably, although the Insurers appear to have been fully aware of their potential right of subrogation against MassPort, they failed to take any action to preserve that right. Thus, the Insurers have rightfully been deprived of their subrogation claims through their own nonfeasance.

Unlike the vast majority of the insurers discussed in the cases above, the Insurers received timely notice of DeMatteo's claim. Newman Aff. ¶¶ 3, 9–10. Having received such timely notice, the Insurers had at least three options as to how to proceed to protect their rights of subrogation: they could have provided full coverage under the Policy and then independently pursued a subrogation claim against MassPort, *Glens Falls Indem. Co. v. Atl. Bldg. Corp.*, 199 F.2d 60, 63 (4th Cir.1952); *Concordia Coll. Corp. v. Great Am. Ins. Co.*, 14 F.R.D. 403, 405 (D.Minn.1953); they could have required DeMatteo to file a tort claim against MassPort, *e.g., Uptegraft*, 662 P.2d at 687 n. 12; or they could have directed DeMatteo to negotiate with MassPort to extend the statute of limitations for filing an action. The Insurers failed to do any of these things, however, and instead disavowed liability under the Policy. "[I]n effect [the Insurers] said to [DeMatteo]: 'We have no interest in any claim which you may have against [MassPort], and we don't care what you do or fail to do in connection with such claim.'" *Newtowne Mfg.*, 187 F.2d at 684–85. Because the Insurers failed to make any effort to preserve their subrogation claims, they forfeited the right to argue that DeMatteo had a duty to protect those claims. *E.g., id.* at 685 ("The [insurer] by reason of its unequivocal and never retracted disavowal of liability on the merits, disbarred itself from setting up such breach of condition as a defense to liability on the policy."); *Uptegraft*, 662 P.2d at 687 n. 12 ("[T]he denial of a claim by the insurer [might] take[ ] it out of the operation of the ...

doctrine because an insurer who has denied a claim cannot later complain of its subrogation rights' destruction."); *Industriales Nicaraguenses*, 443 So.2d at 1063 ("[T]he insurer denied coverage under the policy, made no request of the insured to file suit against the [third party], and therefore, asserted no subrogation rights which were capable of being impaired.").

Nevertheless, the Insurers argue that they never waived their subrogation rights because they explicitly reserved these rights in the Standstill Agreement and each of the amendments thereto. Defs.' Mem. at 8. The Standstill Agreement states:

> [I]t is hearby understood and agreed by and between the parties signing this Agreement, that any action taken by the Insurers or Insureds during the effective period of this agreement investigating the cause of the alleged loss, or investigating and ascertaining the amount of the alleged loss *shall not waive, invalidate, or create an estoppel as to any of the terms and conditions of the policy of insurance, and shall not waive, invalidate or create an estoppel as to any rights whatsoever of the Insurers or Insureds.*

Downs Aff. Ex. B, at 1 (emphasis added). This language, however, does no more than reserve to the Insurers those rights that they contractually possessed under the Policy. Therefore, because DeMatteo was not obligated under the Policy to prevent the statute of limitations for an action against MassPort from running, the Standstill Agreement does not create such a duty.[8]

**C. Massachusetts General Laws chapters 176D and 93A**

The Insurers further argue that even if DeMatteo's right to recover under the Policy is not obviated by DeMatteo's failure to file suit against the Insurers or MassPort within the three-year tort statute of limitations, DeMatteo's claim in Count II for violation of Massachusetts General Laws chapters 176D and 93A fails as matter of law. Defs.' Mem. at 11. The Insurers assert that Massachusetts General Laws chapter 176D does not create a private right of action for individuals injured by unfair claims settlement practices and thus DeMatteo cannot assert a right to recover for violations of chapter 176D pursuant to Massachusetts General Laws chapter 93A, section 11. DeMatteo counters that because liability under the Policy is clear and the Insurers wrongfully denied its claim, the Insurers have committed an unfair settlement practice for which recovery under chapter 93A is available. Pl.'s Opp'n at 12.

**1. Private Cause of Action Under Chapter 176D**

■ As an initial matter, the Insurers' assertion that chapter 176D does not cre-

---

8. DeMatteo also argues that the Insurers, having voluntarily dismissed their timely state court action against MassPort, abandoned their subrogation rights and waived their right to argue that DeMatteo prejudiced their subrogation rights. Pl.'s Opp'n at 9. The Insurers counter that they could not have sought to recover from MassPort in the state court action more than the amount that they had previously paid to DeMatteo, $142,676.00, and that DeMatteo ought to have asserted the claims raised in the present action as a compulsory counterclaim in the state court action. Defs.' Reply at 7–8 & Exs. A & B.

Because the Court has already determined that, pursuant to the Policy, DeMatteo was not obligated to take affirmative action to prevent the statute of limitations from running, the Court expresses no opinion on the complex considerations raised by the parties, except to note that the Joint Stipulation was specifically "without prejudice to any claims, demands, actions, suits, rights, or defenses" in the present suit. Zankowski Aff. Ex. B., at 2.

ate a private cause of action for injured parties is correct. *Ryan v. Fallon Cmty. Health Plan, Inc.,* 921 F.Supp. 34, 38 (D.Mass.1996) (Gorton, J.); *Pariseau v. Albany Int'l Corp.,* 822 F.Supp. 843, 845 (D.Mass.1993). Sections 6 and 7 of chapter 176D afford the Commissioner of Insurance the exclusive authority to enforce chapter 176D. Mass. Gen. Laws ch. 176D, §§ 6–7. Thus, to the extent that Count II attempts to state an independent claim for recovery under chapter 176D, it must fail. Because Count II of DeMatteo's complaint does not appear to be grounded on a theory that DeMatteo can recover under chapter 176D, but rather that it can recover under chapter 93A for the Insurers' alleged violations of chapter 176D, *see* Am. Compl. ¶ 25; Pl.'s Opp'n at 12, however, such a summary conclusion is insufficient.

### 2. Stating a Claim for Violation of Chapter 93A, Section 11

Count II does not identify under which section of chapter 93A DeMatteo intends to bring its claim. Nevertheless, because DeMatteo is a business engaged in commerce, it falls within the ambit of section 11.[9] Section 9(1) of chapter 93A expressly allows a *section 9* plaintiff to bring an action against persons violating clause 9 of section 3 of chapter 176D as well as against persons violating section 2 of chapter 93A. Mass. Gen. Laws ch. 93A, § 9(1). Because of the explicit statement in section 9(1), a section 9 plaintiff "may recover for violations of G.L. c. 176D, § 3, cl. 9, without regard to whether the violation was unlawful under G.L. c. 93A, § 2." *Polaroid*

*Corp. v. Travelers Indem. Co.,* 414 Mass. 747, 754, 610 N.E.2d 912 (1993).

■ In contrast, *section 11* of chapter 93A omits any reference to the ability of a section 11 plaintiff, such as DeMatteo, to recover for violations of section 9 of chapter 176D. Rather, section 11 simply allows recovery against persons violating section 2. Mass. Gen. Laws ch. 93A, § 11; *John Beaudette, Inc. v. Sentry Ins. A Mut. Co.,* 94 F.Supp.2d 77, 110 n. 37 (D.Mass.1999) (Bowler, Mag.); *Kiewit Constr. Co. v. Westchester Fire Ins. Co.,* 878 F.Supp. 298, 301–02 (D.Mass.1995). Accordingly, as unequivocally stated by the Supreme Judicial Court, "[section] 11 does not grant an independent right to recover for violations of G.L. c. 176D, § 3, cl. 9." *Polaroid,* 414 Mass. at 754, 610 N.E.2d 912 (citing *Jet Line Servs., Inc. v. Am. Employers Ins. Co.,* 404 Mass. 706, 717 n. 11, 537 N.E.2d 107 (1989)). *But cf. R.W. Granger & Sons, Inc. v. J & S Insulation, Inc.,* 435 Mass. 66, 74, 754 N.E.2d 668 (2001) (refusing to consider defendant's claim that violations of chapter 176D, section 3(9) do not "support" a finding of violation of chapter 93A, section 11 because defendant failed to raise the issue before the trial judge). Instead, section 11 plaintiffs must "satisfy the elements of a claim based on an alleged unfair and deceptive practice under Section 2 of Chapter 93A." *RLI Ins. Co. v. Gen. Star Indem. Co.,* 997 F.Supp. 140, 151 (D.Mass.1998) (Keeton, J.).

Thus, because DeMatteo is an entity engaged in trade or commerce for purposes of chapter 93A, as matter of law,

---

9. Sections 9 and 11 of chapter 93A provide private causes of action for violations of Massachusetts General Laws chapter 93A, section 2, but for different classes of plaintiffs. A plaintiff under section 9 is defined as "[a]ny person, other than a person entitled to bring action under section eleven of this chapter." Mass. Gen. Laws ch. 93A, § 9(1). A plaintiff under section 11 is defined as "[a]ny person

who engages in the conduct of any trade or commerce." *Id.* § 11. All that is required for a plaintiff to fall within the ambit of section 11 is some transaction in a business context. *Int'l Fid. Ins. Co. v. Wilson,* 387 Mass. 841, 852, 443 N.E.2d 1308 (1983). DeMatteo is therefore a section 11 plaintiff, not a section 9 plaintiff.

DeMatteo can sue only under section 11 of chapter 93A for a violation of section 2 of that chapter, and not under either section 9 or section 11 of that chapter for a violation of chapter 176D. The Insurers assert that DeMatteo has "failed to come forth with any evidence" to support such a claim for unfair and deceptive trade acts and practices. Defs.' Mem. at 12. DeMatteo counters that the Insurers' failure "to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear" constitutes a violation of chapter 93A.[10] Pl.'s Opp'n at 12 (citing *Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*, 169 F.3d 43, 56 (1st Cir.1999), and *Equitable Life Assurance Soc'y of the U.S. v. Porter–Englehart*, 867 F.2d 79, 88 (1st Cir.1989)).

■ DeMatteo's allegation, which draws directly from the language of chapter 176D, section 3(9)(f) ("An unfair claim settlement practice shall consist of ... [f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."), appears simply to restate a claim under chapter 176D, under the guise of a chapter 93A, section 11 claim. DeMatteo argues, however, that "[w]hile it may be true that a violation of 176D cannot constitute a 'per se' violation of Chapter 93A, conduct that may constitute a violation of 176D can be a basis for finding an 'unfair and deceptive' trade

practice under Ch. 93A, § 11." Pl.'s Opp'n at 12 (citing *Kiewit*, 878 F.Supp. at 298).

Although the position espoused by DeMatteo—in which corporate plaintiffs are prohibited from stating that violations of chapter 176D are *per se* violations of chapter 93A, but are not prohibited from stating that conduct that violates chapter 176D also violates chapter 93A—may seem odd, it is supported by *Kiewit Construction Co. v. Westchester Fire Insurance Co.*, 878 F.Supp. 298 (D.Mass.1995). In *Kiewit*, the court began by noting that an entity that is engaged in the conduct of trade or commerce might attempt to frame three different types of claims under chapter 93A against an insurance company that had used unfair claims settlement practices. First, the plaintiff might attempt to proceed under section 9 of chapter 93A, which, on its face, affords a remedy to "any person whose rights are affected by another person violating the provisions of clause (9) of section three of [chapter 176D]." *Id.* at 301. Such a claim fails, however, because "despite the literal language of Section 9, only individual consumers, not persons engaged in trade or commerce, may sue under Section 9 for unfair claims settlement practices which violate 176D." *Id.* Second, the plaintiff might attempt to proceed under section 11 of chapter 93A "based on a theory that 93A in effect incorporates 176D, with the result

---

**10.** The Insurers attack Count II under Federal Rule of Civil Procedure 56, stating that DeMatteo has "failed to come forth with any evidence of any such conduct," Def.'s Mem. at 12, while DeMatteo responds as though the Insurers had attacked Count II under Federal Rule of Civil Procedure 12(b)(6). *See* Pl.'s Opp'n at 12 ("Clearly [DeMatteo's] Complaint satisfies the liberal pleading requirements as it provides a generalized statement of facts that provides the Insurers sufficient notice to file a responsive pleading." (citing *Garita Hotel Ltd. P'ship v. Ponce Fed. Bank*, 958 F.2d 15, 17 (1st Cir.1992))). DeMatteo's confusion

may be caused by the fact that the Insurers prefaced this section of their memorandum with a heading that stated "Plaintiff's Mass. Gen. Laws. C. 93A and 176D Claims Must Be Dismissed." Def.'s Mem. at 11. Nevertheless, DeMatteo was clearly on notice that the Insurers' motion is styled as a motion for summary judgment and DeMatteo submitted two affidavits and numerous exhibits in opposition to the Insurers' motion. It therefore is not in any way inequitable for the Court to treat the motion as one for summary judgment.

that any practice which violates 176D constitutes a *per se* violation of Section 2 of 93A." *Id.* Such a claim fails, however, in light of the two cases in which the Supreme Judicial Court rejected the theory that commercial plaintiffs may bring suit under section 11 of chapter 93A for purported violations of chapter 176D. *Id.* at 301–02 (citing *Polaroid,* 414 Mass. at 754, 610 N.E.2d 912, and *Jet Line,* 404 Mass. at 717, 537 N.E.2d 107 n. 11). Finally, the plaintiff "might argue, without any reference to or assistance from 176D, that the insurance company's practices violate Section 2, and, therefore, Section 11 of 93A because, under traditional 93A analysis, they are unfair or deceptive." *Id.* at 301. Thus, *Kiewit* concluded that "[t]o say . . . that Section 11 of 93A does not incorporate 176D is not to say that *conduct* that happens to violate 176D may never be 'unfair or deceptive' within the meaning of Section 2 of 93A, and, thus, actionable under Section 11." *Id.* at 302; *see also R.W. Granger,* 435 Mass. at 78, 754 N.E.2d 668 (citing *Kiewit,* 878 F.Supp. at 301–02, and holding that the trial judge could rely on violations of chapter 176D, section 3(9) as "persuasive evidence" that the defendant wilfully or knowingly engaged in unfair business practices proscribed by chapter 93A).

The question for this Court therefore becomes whether the conduct alleged by DeMatteo—the failure to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear—is unfair or deceptive within the meaning of chapter 93A. To support this proposition, DeMatteo cites *Ferrara & DiMercurio,* 169 F.3d at 56, *Equitable Life Assurance,* 867 F.2d at 88, and *Ferrara & DiMercurio, Inc. v. St. Paul Mercury Insurance Co.,* 173 F.R.D. 7, 15 (1997) (Bowler, Mag.).

*Equitable Life Assurance* fails to support DeMatteo's position because that case involved a suit under chapter 93A, section

9. Thus, the plaintiff could state a claim based on the insurer's alleged violation of chapter 176D. *Equitable Life Assurance,* 867 F.2d at 88 ("Those injured by insurance practices proscribed under Chapter 176D may sue under Chapter 93A." (citing Mass. Gen. Laws ch. 93A, § 9(1))).

DeMatteo garners support for its position through citation to the *Ferrara & DiMercurio* opinions, however. In the district court opinion, after a thorough discussion of the interrelationship of chapter 176D and chapter 93A in the context of a corporate plaintiff, the court concluded that "[w]hile the insurer's alleged behavior might fall within the confines of section 2 as an unfair or deceptive act, 'a violation of chapter 176D does not automatically violate § 2.'" *Ferrara & DiMercurio,* 173 F.R.D. at 15 (quoting *F.C.I. Realty Trust v. Aetna Cas. & Sur. Co.,* 906 F.Supp. 30, 32 n. 1 (D.Mass.1995) (O'Toole, J.)). Nevertheless, the court went on to state that:

> Under section 11, a business practice is considered unfair if it is within the penumbra of some common-law, statutory . . . or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to other businessmen. Conduct which violates section 3(9)(f) of chapter 176D, i.e., failing to promptly effectuate settlements when liability becomes reasonably clear, may therefore support liability under sections 2 and 11 of chapter 93A, but a finding that [the insurer] violated chapter 176D does not establish a violation of section 11 of chapter 93A.

*Id.* (citations and internal quotation marks omitted).

In the First Circuit opinion, the court largely adopted the district court's analysis. *Ferrara & DiMercurio,* 169 F.3d at 56 ("It is an unfair settlement practice, and also an unfair or deceptive act or practice

under Mass. Gen. Laws. ch. 93A, if an insurance company fails 'to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.'" (footnote omitted)). Although the First Circuit—which failed to distinguish between section 9 and 11 plaintiffs and appears to have concluded that *all* those injured by insurance practices proscribed by chapter 176D may sue under chapter 93A—overstates its point,[11] it is nevertheless clear that DeMatteo can attempt to state a claim under chapter 93A by alluding to conduct that is impermissible under chapter 176D.

### 3. Was Liability Under the Policy Reasonably Clear?

 Although DeMatteo states a claim under section 11 of chapter 93A, the facts viewed in the light most favorable to DeMatteo do not show that the Insurers failed to settle DeMatteo's claim promptly after their liability had become reasonably clear. *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 809, 575 N.E.2d 1107 (1991); *Kourouvacilis v. Gen. Motors Corp.*, 410 Mass. 706, 716, 575 N.E.2d 734 (1991). In determining whether an insurer's liability was "reasonably clear," "an objective standard of inquiry into the facts and the applicable law" must be employed. *Demeo v. State Farm Mut. Auto. Ins. Co.*, 38 Mass.App.Ct. 955, 956, 649 N.E.2d 803 (1995). The test is "whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff." *Id.* at 956–57, 649 N.E.2d 803; *see also Hartford Cas. Ins. Co. v. N.H. Ins. Co.*, 417 Mass. 115, 121, 628 N.E.2d 14 (1994).

 In the instant case, DeMatteo filed a claim with the Insurers in which it sought to recover the costs of "extended construction ..., the cessation of work, emergency repairs, and ... labor, material, and equipment to mitigate the loss and to reclaim the Project site." Am. Compl. ¶ 12. As an element of its emergency repairs, DeMatteo notes that "stop logs" were installed to replace the missing flood gate and a steel bulkhead was installed to seal off MassPort's outfall pipe and to divert drainage to other sections of the pipe. Pl.'s Opp'n at 2–3; Newman Aff. ¶¶ 4–6, 8. Thus, the Insurers assert, "by [DeMatteo's] own admission [it] seek[s] amounts incurred to repair the *pre-existing* 120–inch outfall pipe." Defs.' Reply at 10; *see also* Newman Aff. ¶¶ 2, 4, 5, 8 (referring to pre-existing structures). The Policy, however, expressly excludes coverage for "[e]xisting property at the site of the *CONTRACT WORKS*." Downs Aff. Ex. A, Manuscript Form, at 6. The Policy also states that "[i]n the event of claim for loss or damage, the liability of the Company shall not exceed the cost to repair or replace the property lost or damaged." *Id.* at 17. The Insurers therefore assert that liability does not extend to costs, such as those claimed by DeMatteo, incurred from "emergency measures taken to mitigate the problem," Newman Aff. Ex. Al, or to costs incurred to protect the contract works from further damage. Defs.' Reply at 11. The Insurers further maintain that the costs that DeMatteo claims it incurred as a result of the thirty-six day delay in its contract work, *supra* note 3, are expressly excluded by the Policy. *See* Defs.' Reply at 11; Downs Aff. Ex. A, Manuscript Form, at 7 (excluding "[c]onsequential loss or damage of any kind or description in-

---

**11.** Notably, the First Circuit cited *Equitable Life Assurance* for the proposition that "those injured by insurance practices proscribed by chapter 176D may sue under chapter 93A."

*Ferrara & DiMercurio*, 169 F.3d at 56. As discussed at length above, this assertion is *not* true in the context of section 11 plaintiffs.

cluding loss of market or delay, whether caused by a peril insured against or otherwise").

Reading this Policy language in its usual and ordinary sense, *Somerset Sav. Bank v. Chicago Title Ins. Co.*, 420 Mass. 422, 427, 429, 649 N.E.2d 1123 (1995), it is evident that "a reasonable person, with knowledge of the relevant facts and law" would not necessarily conclude that the Insurers were liable to DeMatteo for the majority of its claim. *See, e.g., Demeo*, 38 Mass.App.Ct. at 956–57, 649 N.E.2d 803. Given such Policy language, there was no "good reason" for the Insurers to have automatically concluded that they were liable to DeMatteo. *Hochen v. Bobst Group, Inc.*, 198 F.R.D. 11, 17 (D.Mass.2000) (Collings, Mag.). " '[L]iability under c. 176D and c. 93A does not attach merely because an insurer concludes that it has no liability under an insurance policy' . . . . A plausible, reasoned legal position that may ultimately turn out to be mistaken—or simply . . . unsuccessful—is outside the scope of the punitive aspects of the combined application of c. 93A and c. 176D." *Guity v. Commerce Ins. Co.*, 36 Mass.App. Ct. 339, 343, 631 N.E.2d 75 (1994) (citations omitted). Thus, even though a jury may ultimately conclude that the Insurers breached their contractual obligation to DeMatteo,[12] because liability under the Policy is not clear, the Insurers are entitled to summary judgment on DeMatteo's claim pursuant to Massachusetts General Laws chapter 93A, section 11.[13]

### IV. Conclusion

For the foregoing reasons, the Court DENIED the Insurers' motion for summary judgment [Docket No. 31] as to Count I—Breach of Contract, and GRANTED the Insurers' motion for summary judgment as to Count II—Violation of Chapter 93A and Chapter 176D. Order of Aug. 22, 2001 [Docket No. 43].

---

**12.** Apart from their argument that the entire complaint ought fail because of DeMatteo's dereliction of its duty to preserve their subrogation rights, the Insurers did not argue that they are entitled to summary judgment on Count I, DeMatteo's breach of contract claim. Thus, the Court did not review the record to determine (and expresses no opinion as to) whether there are genuine issues of material fact as to the Insurers' alleged breach of contract.

**13.** Interestingly, unlike the typical motion for summary judgment, in which the parties' material factual dispute would defeat the motion, in the instant case, the dispute over the scope of the Policy's coverage entitles the Insurers to summary judgment because if such disagreement is possible, liability under the Policy is not reasonably clear.